ECOLOGICAL RIGHTS FOUNDATION; Mateel Environmental Justice Foundation, Plaintiffs–Appellants,

v.

PACIFIC LUMBER COMPANY, Defendant–Appellee.

No. 99–17076.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 2000

Filed Oct. 30, 2000

---

1. One week after NMB filed its action in district court, the government filed suit against NMB in the CIT.

Sharon E. Duggan, San Francisco, California, and William Verick, Klamath Environmental Law Center, Eureka, California, for the plaintiffs-appellants.

Jared G. Carter, Scotia, California, and Michael D. Macomber and Frank Shaw Bacik, Ukiah, California, for the defendant-appellee.

Before: BOOCHEVER, TROTT and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Plaintiff organizations Ecological Rights Foundation ("ERF") and Mateel Environmental Justice Foundation ("Mateel") brought this lawsuit against Pacific Lumber Company alleging various violations of the Federal Water Pollution Control Act of 1972, better known as the Clean Water Act, see 33 U.S.C. § 1251 et seq., at Pacific Lumber's Yager Camp and Carlotta mill operations in Humboldt County, California. The district court granted Pacific Lumber's motion for summary judgment on the ground that the plaintiffs lacked standing to sue. ERF and Mateel appeal the district court's standing ruling. We conclude that the district court's approach to standing cannot be squared with *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), decided after the district court judgment issued in this case, and that applying *Laidlaw*, the two plaintiff organizations do have standing to pursue this litigation. Because Pacific Lumber's other arguments, whether valid or not, would not support dismissal of this case, we reverse the judgment and remand the case for further district court proceedings.

## I.

### Background

1. *Yager Creek*

Yager Camp and the Carlotta sawmill both abut Yager Creek. Runoff from these two facilities drains into the creek and waterways further downstream. The creek flows through Yager Camp, a 150–acre site that includes a truck wash operation, a composting area, and log decks to store logs before they are sent to the Carlotta sawmill. The mill, located just downstream of Yager Camp, occupies more than 70 acres alongside the creek. The mill facility also includes truck shops, an aggregate crusher, and more log decks.

Yager Creek flows into the Van Duzen River about a mile below the Carlotta mill. The Van Duzen in turn empties into the Eel River, and the Eel reaches the Pacific Ocean about 12 miles from Pacific Lumber's facilities. Yager Creek and the other rivers in the Eel River system are used for swimming, boating, and other recreational activities. Various forms of wildlife inhabit the area nourished by Yager Creek, and fish use the creek to migrate to their spawning grounds.

Several members of ERF and Mateel use Yager Creek for recreation. They particularly enjoy their visits because they can view wildlife in and around the creek. The organizations' members avoid some activities they would otherwise enjoy in and around Yager Creek, however, because they fear that runoff from Pacific Lumber's two facilities is damaging the creek and its wildlife, and enjoy other activities less than they would if there were no such runoff. Among the several members of the plaintiff organizations who use the creek for recreational activities, two are particularly significant for this case.

Christopher Hinderyckx, a member of Mateel, began visiting the creek in 1989 when he was commuting from his home in southern Humboldt County to attend classes at the College of the Redwoods in Arcata. Since completing his coursework, he has continued to drive to Arcata often, sometimes stopping along the creek. Over the years, Hinderyckx has gone swimming in Yager Creek at least a dozen times. Although Hinderyckx has enjoyed swimming in Yager Creek, he is less likely to swim there in the future, because he now has information that suggests to him that the creek may be polluted. Hinderyckx also hesitates to fish in the creek because he is concerned about harmful pollutants in the water. And because the creek is not as clean as it should be, Hinderyckx maintains, he aesthetically enjoys his re-

creational activities there less than he otherwise would.

Similarly, Frederic Evenson, a Humboldt County resident since 1990 and an ERF member, takes part in various recreational activities on and downstream of Yager Creek, including swimming and snorkeling in the creek near Carlotta and observing wildlife. He "derive[s] immense pleasure, strength and inspiration" from these visits. Evenson plans to continue these visits to Yager Creek, but his enjoyment of Yager Creek and the downstream waterways is impaired by discharges of pollutants from Carlotta and Yager Camp.

### 2. Statutory Background

Yager Camp and the Carlotta sawmill are subject to the mandates of the Clean Water Act ("CWA"). See 33 U.S.C. § 1251 et seq. A linchpin of the CWA's regulatory scheme is the National Pollution Discharge Elimination System ("NPDES") permit program, which allows certain discharges of pollutants only if in compliance with government-issued permits, and imposes related monitoring and reporting requirements. See 33 U.S.C. § 1342. The Clean Water Act makes illegal any discharges of pollutants that are not specifically allowed by an NPDES permit. 33 U.S.C. § 1311(a).

Under the Clean Water Act, the states, with EPA's approval, may issue and administer NPDES permits. See 33 U.S.C. § 1342(b); see also Cal. Water Code § 13370 (expressing California's intent to implement an NPDES program at the state level). In California, the State Water Resources Control Board ("SWRCB") issues and administers a so-called General Permit that regulates discharges of pollutants into California's waters. Industrial facilities in California subject to the Clean Water Act must either comply with the General Permit or obtain individualized NPDES permits. See SWRCB Water Quality Order No. 97–03–DWQ, NPDES General Permit No. CAS000001 at 2 ¶ 5 (hereinafter "General Permit").

Among the conditions imposed by the 1997 General Permit are prohibitions on non-storm water discharges of pollutants into the state's waterways except those specifically allowed, as well as strict limits on the discharge of pollutants into storm water.[1] In addition, each facility subject to the General Permit must develop and implement an effective Storm Water Pollution Prevention Plan ("SWPPP") "to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges." 1997 General Permit at 2 ¶ 10. Substantially similar, albeit less detailed, requirements were in place in the precursor to the 1997 General Permit that was in effect from 1992 through 1996.

### 3. This Litigation

The plaintiff organizations brought this action pursuant to the CWA's citizen suit provision, claiming violations of the General Permit. The Clean Water Act allows any citizen to sue "any person ... who is alleged to be in violation of ... an effluent standard or limitation under this chapter or ... an order issued by the [EPA] Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365. An "effluent standard or limitation" is further defined to include "a permit or condition thereof issued under section 1342 of this title." 33 U.S.C. § 1365(f)(6).

At least 60 days before filing a lawsuit, a potential plaintiff must notify the alleged violator of her intent to sue. See 33 U.S.C. § 1365(b)(1)(A); see also National Environmental Foundation v. ABC Rail Corp.,

---

1. For the purpose of the NPDES program, "storm water" is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. Ch. 1 § 122.26(b)(13). "Non-storm water discharge" is "any discharge to storm sewer systems that is not composed entirely of storm water except discharges pursuant to a NPDES permit and discharges resulting from fire fighting activities." 1992 General Permit Attachment 4 ¶ 4.

926 F.2d 1096, 1097–98 (11th Cir.1991) (compliance with § 1365(b) is a mandatory prerequisite to citizen suit). Such notice must include

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3.

To comply with this notice requirement, ERF and Mateel sent letters to Pacific Lumber on October 30 and November 12, 1996, giving notice of intent to sue regarding alleged CWA violations at Yager Camp and Carlotta, respectively. The Yager Camp letter alleged the following violations of the 1992 General Permit: unpermitted discharges of contaminated storm water; failure to prepare and implement an adequate SWPPP;[2] failure to comply with the General Permit's reporting and monitoring conditions; and failures to conduct required visual observations and to collect storm water samples. The Carlotta letter alleged: discharges of pollutants in violation of the 1992 General Permit; failure to prepare and implement an adequate SWPPP; failure to monitor discharges of pollutants in violation of the General Permit's conditions; failures to conduct visual observations and to collect and analyze storm water samples; inadequate recordkeeping and reporting; failure to mitigate discharges of pollutants; and failure to

properly operate and maintain facilities to minimize pollution. The letters also alleged that both sites were in violation of California's "Proposition 65," Cal. Health & Safety Code § 25249.5.[3]

On January 28, 1997, ERF and Mateel filed a complaint against Pacific Lumber, reiterating the allegations of 1992 General Permit violations that were set forth in the Yager Camp and Carlotta letters.[4] The plaintiffs filed their first amended complaint, alleging violations of the 1997 General Permit then in effect, on August 12, 1998, without first sending new 60–day notice letters to Pacific Lumber. Both the complaint and the amended complaint sought injunctive and declaratory relief, civil penalties, and attorneys' fees. Pacific Lumber sought dismissal of the lawsuit on several grounds, including standing, mootness, and the sufficiency of the 60–day notice letters.

On cross-motions for summary judgment, the district court concluded that ERF and Mateel lacked standing, and dismissed their lawsuit. *Ecological Rights Foundation v. Pacific Lumber Co.*, 61 F.Supp.2d 1042, 1058 (N.D.Cal.1999). Because the district court dismissed the case, it had no reason to and did not reach the other issues raised by the parties in their summary judgment motions. The plaintiffs seek reversal of the district court's decision on standing, while Pacific Lumber urges us to affirm the district court either on standing grounds or on the mootness or inadequate notice arguments raised but not decided in the district court.

---

2. At that time, Pacific Lumber was four years late in filing an SWPPP for Yager Camp. The company filed a Yager Camp SWPPP on November 8, 1996. In response to comments from the SWRCB, the company amended and refiled the Yager Camp SWPPP on January 27, 1997.

3. "No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or

probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9 [describing exemptions]."

4. Although the General Permit expired on November 19, 1996, and the 1997 General Permit did not take effect until July 1, 1997, plaintiffs do not dispute that during the interim between General Permits, Pacific Lumber could discharge into Yager Creek as long as the discharges remained in compliance with the 1992 General Permit.

## II.

### Standing Issue

 The CWA's citizen suit provision extends standing to the outer boundaries set by the "case or controversy" requirement of Article III of the Constitution. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 16, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Because the statutory and constitutional standing issues therefore merge, the only standing issue before us, which we determine de novo, is whether the plaintiffs have standing under Article III to proceed to the merits of their lawsuit. *Alaska Wildlife Alliance v. Jensen,* 108 F.3d 1065, 1068 (9th Cir.1997). We conclude that Mateel and ERF have Article III standing based on Hinderyckx's and Evenson's use, respectively, of Yager Creek, and therefore do not address the plaintiffs' alternative standing theory based on direct injuries to the plaintiff groups' organizational interests.[5]

### 1. Organizational Standing in Environmental Cases

 An organization has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also International Union, United Auto., Aerospace and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).[6] Individual members

would have standing in their own right under Article III if "they have suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical, ... the injury is fairly traceable to the challenged action of the defendant; and ... it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw,* 120 S.Ct. at 704 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The dispute in this case hinges principally on whether any individual members of ERF and Mateel have alleged an "injury in fact," and therefore would have standing to sue in their own right.

 The "injury in fact" requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct. *See, e.g., Laidlaw,* 120 S.Ct. at 705; *Defenders of Wildlife,* 504 U.S. at 562–63, 112 S.Ct. 2130; *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1094 (9th Cir.1998). The district court in this case so recognized, but concluded nonetheless that none of the members of ERF and Mateel who submitted affidavits in support of the organizations' standing alleged contacts with Yager Creek sufficient to state an injury in fact to their recreational and aesthetic interests, explaining its decision as follows:

> Despite the low threshold required for satisfying the injury in fact requirement, the court does not find that plaintiffs'

---

**5.** Pacific Lumber's argument that 33 U.S.C. § 1365 does not allow for organizations to sue in their capacity as representatives of their members' interests is necessarily foreclosed by *Laidlaw,* itself a Clean Water Act citizen suit brought by several environmental organizations on behalf of their members.

**6.** The first two *Hunt* criteria satisfy Article III's "case or controversy" requirement by ensuring that the organization's claim will be litigated vigorously, while the third is merely prudential, promoting only administrative convenience and efficiency. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 555–57, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

submissions regarding harm to their members and their members' connection to Yager Creek to be adequate.... [E]ven in view of the statements of plaintiffs' members construed in a light most favorable to plaintiffs, the court finds that the members' spatial and temporal contacts with Yager Creek are too sporadic or attenuated to satisfy the injury in fact prong of the standing analysis. Importantly, none of the plaintiffs' affiants state that they live in the vicinity of Yager Creek or regularly use Yager Creek for recreational or aesthetic purposes.

61 F.Supp.2d at 1057.

The district court's standing ruling, it thus appears, turned on the supposition that a plaintiff can only establish standing in an environmental case on the basis of aesthetic or recreational interests if she lives some specified distance from the area covered by the lawsuit *and* repeats her use of the area at some prescribed interval. The "injury in fact" requirement in environmental cases is not, however, reducible to inflexible, judicially mandated time or distance guidelines, as *Laidlaw* makes clear.

### 2. *Injury in Fact Under Laidlaw*

Before *Laidlaw,* the Supreme Court examined the "injury in fact" requirement in environmental cases in detail in two cases. *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130 (affirming grant of summary judgment for lack of standing because plaintiffs did not meet their obligation under Fed.R.Civ.P. 56(e) to allege sufficiently specific facts demonstrating their use of the contested area); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (denying standing because plaintiffs could show only "speculative 'someday' intentions to visit endangered species halfway around the world").[7] The plaintiff organizations in *Defenders of Wildlife* and *National Wildlife Federation* sought to litigate the validity of broadly applicable environmental rulings. A few of their members made allegations concerning their connections to the extensive areas covered by those rulings, but the averments supporting those allegations were either extremely vague (in *National Wildlife Federation*) or extremely speculative (in *Defenders of Wildlife*). Because the plaintiffs in both *Defenders of Wildlife* and *National Wildlife Federation* failed to show any tangible, continuing connection to any particular location affected by the challenged decision, they could not assure "that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ *Laidlaw,* on the other hand, involved a situation, like this one, in which the litigation was narrowly focused and the

7. More specifically:

In *Lujan v. National Wildlife Federation*, the Court denied standing to two environmental organizations because their members attested only to taking part in recreational activities "in the vicinity of" vast tracts of land, small sections of which would be opened to mining by a challenged Bureau of Land Management order. 497 U.S. at 886–89, 110 S.Ct. 3177. The plaintiffs' declarations, that is, were too vague to establish that any of their members had *any* ascertainable aesthetic or recreational interest, past or future, in the exact areas affected by the challenged environmental decision.

In *Lujan v. Defenders of Wildlife*, two members of Defenders of Wildlife averred that they had in the past visited the habitats of certain endangered species halfway around the world, and were harmed by the Agency for International Development's (AID) plans to help finance foreign development projects that would threaten the animals' habitats. Although the two women had visited these areas before, they had no specific plans to travel the huge distances involved again. It was therefore entirely speculative, at best, and unlikely, at worst, that the AID's actions would actually affect their future lives. 504 U.S. at 564, 112 S.Ct. 2130.

plaintiffs' allegations of injury quite specific. In *Laidlaw*, several environmental organizations brought a Clean Water Act citizen suit for injunctive relief and civil penalties alleging that Laidlaw Environmental Services was violating its NPDES permit at a hazardous waste incinerator on the banks of South Carolina's North Tyger River. 120 S.Ct. at 701. Several of the plaintiff organizations' members filed declarations detailing the injury they had or would suffer because of suspected pollution of the river. Of those members, some lived within two miles of the incinerator, another lived 20 miles away, and still others did not specify where they lived. Some of the members filing declarations said that they had engaged in recreational activities on the river in the past, while others were deterred from such activities by Laidlaw's alleged discharges of pollutants. One affiant claimed only that he "had canoed" on the river some 40 miles downstream from the incinerator. Considering the standing question *sua sponte*,[8] the Supreme Court held that all these individual members of the plaintiff organizations had stated injuries to their aesthetic and recreational interests sufficiently specific to allow standing, because all of them "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." 120 S.Ct. at 705 (quoting *Sierra Club*, 405 U.S. at 735, 92 S.Ct. 1361).

▮ Under *Laidlaw*, then, an individual can establish "injury in fact" by showing a connection to the area of concern sufficient to make credible the contention that the

person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded. Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner.

Daily geographical proximity, for instance, may make actual past recreational use less important in substantiating an "injury in fact," because a person who lives quite nearby is likely to notice and care about the physical beauty of an area he passes often. See *Laidlaw*, 120 S.Ct. at 704 (FOE member alleged injury in fact because "he lived a half-mile from Laidlaw's facility; ... he occasionally drove over the North Tyger River, and ... it looked and smelled polluted"); *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (affiant who passed the Hudson River regularly and found its pollution "offensive to his aesthetic values" stated injury in fact). On the other hand, a person who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation. Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person. *Id.* at 705 (finding that an individual who has canoed in the river and would do so again, closer to

---

**8.** Pacific Lumber attempts to relegate *Laidlaw*'s standing analysis to a second- or third-class precedential rank because the Court raised the issue *sua sponte*. Standing, it is true, was not one of the issues upon which certiorari was granted in *Laidlaw*. The Court explained, however, why it addressed the standing question: "Because we hold that the Court of Appeals erred in declaring the case moot, we have an obligation to assure ourselves that [Friends of the Earth] had Article III standing at the outset of the litigation." 120 S.Ct. at 704. The extensive standing dis-

cussion in *Laidlaw* was therefore necessary to the Court's decision, and is binding upon us. *United States v. Underwood*, 717 F.2d 482, 486 (9th Cir.1983) (en banc). We are no more empowered to ignore a square holding of the Supreme Court because the decided issue was not an issue upon which certiorari was granted than for any other reason. See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 246 n. 12, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (Supreme Court may address questions outside the scope of the writ of certiorari when necessary to resolve a case).

the discharge point, were it not for the discharges has made a sufficient "injury-in-fact" showing). An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year is not precluded from litigating to protect the environmental quality of Yosemite Valley simply because he cannot visit more often.

This flexible approach is the only one consistent with the nature of the aesthetic and recreational interests that typically provide the basis for standing in environmental cases. As the Supreme Court has explained, "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society." *Sierra Club,* 405 U.S. at 734, 92 S.Ct. 1361. Yet, aesthetic perceptions are necessarily personal and subjective, and different individuals who use the same area for recreational purposes may participate in widely varying activities, according to different schedules. *Laidlaw* confirms that the constitutional law of standing so recognizes, and does not prescribe any particular formula for establishing a sufficiently "concrete and particularized," *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130, aesthetic or recreational injury-in-fact.[9]

### 3. *Injury in Fact in this Case*

 Evaluating the record in this case in accord with *Laidlaw,* there is no doubt that both plaintiff organizations have come forward with sufficient factual averments to survive summary judgment on the standing issue. Both Hinderyckx, a member of Mateel, and Evenson, a member of ERF, stated longstanding recreational and aesthetic interests in Yager Creek, the specific place at issue in this case. Both have used the creek for recreational activities several times in the past, and both have alleged that Pacific Lumber's conduct has impaired their enjoyment of those activities. Hinderyckx, like the affiants in *Laidlaw,* testified that he is deterred from fully enjoying Yager Creek because of his concerns about pollutants discharged from Pacific Lumber's facilities adjacent to the creek; although he likes to fish, he refrains from fishing in the creek because of concerns about pollution, and he is less likely to swim at some places along the creek than he used to be. And both Hinderyckx and Evenson, like the affiants in *Laidlaw,* expressed an interest in participating in recreational activities in and around Yager Creek in the future, and in continuing to enjoy the beauty of the area.[10]

9. The few environmental standing cases decided by other circuits since *Laidlaw* are consistent with our understanding of the injury-in-fact requirement. *See Central & South West Servs., Inc. v. United States EPA,* 220 F.3d 683, 698–702 (5th Cir.2000) (individual affiants' injuries were too speculative to merit standing to challenge EPA's final rule on PCB use and disposal because their alleged injuries were predicated on a series of hypothetical events that had not occurred); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 156–60 (4th Cir.2000) (en banc) (an affiant who lived adjacent to a creek four miles downstream from an alleged polluter's discharges stated an injury in fact sufficient to confer standing on an environmental group to which he belonged, while citing with approval cases from other circuits asserting different but still specific and concrete connections between the plaintiff and the area concerned in the litigation); *American Petroleum Institute v. United States EPA,* 216 F.3d 50, 64–65 (D.C.Cir.2000) (a plaintiff environmental organization lacked standing because an individual affiant who otherwise would have satisfied Article III standing requirements failed to show that he was a member of the organization, a defect not here at issue.).

10. The district court also suggested that for an organization to obtain standing based on a *single* member's allegations, the individual asserting an injury to an aesthetic or recreational interest in a natural resource *must* have regular or "continuous" contacts with the resource. 61 F.Supp.2d at 1058. However, *Laidlaw* clarifies that there is no such requirement. In *Laidlaw,* the Supreme Court found that the Sierra Club had standing even though, at least so far as the Court tells us, the only Sierra Club member submitting an affidavit for standing testified only to canoeing once on the affected river some 40 miles from the challenged discharges of pollutants. 120 S.Ct. at 705. If the sole affiant could have brought a citizen suit as an individual, then he has stated an injury in fact sufficient to confer standing on an organization that seeks to sue on his behalf. *Hunt* requires

Like the affiants on whom standing was based in *Laidlaw,* then, Hinderyckx and Evenson "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw,* 120 S.Ct. at 705 (internal citations omitted). We conclude that ERF and Mateel have standing to sue based on the injuries alleged by Hinderyckx and Evenson.

4. *Other Standing Issues Raised in this Appeal*

■■■ One last point requires mention: Pacific Lumber argues that the plaintiffs lack standing because they have demonstrated neither actual environmental harm to Yager Creek itself, nor that the company caused any such harm. As the district court correctly recognized, however, *see* 61 F.Supp.2d at 1055, the threshold question of citizen standing under the CWA is whether an individual can show that *she* has been injured in her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm. *See Laidlaw,* 120 S.Ct. at 704; *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 163–64 (4th Cir.2000) (en banc). This is so for at least two reasons.

■■■ First, under many environmental protection statutes, harm to the environment need not ever be proved; the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural. *See* 33 U.S.C. § 1365(f)(6) (citizen suit may allege violation of permit or condition thereof); 33 U.S.C. § 1318 (outlining procedural requirements of NPDES permits, including reporting, monitoring, and record-keeping). As the *Laidlaw* Court explained, requiring a plaintiff to demonstrate actual environmental harm in order to obtain standing would, in many Clean Water Act lawsuits, compel the plaintiff to prove more to show standing than she would have to prove to succeed on the

merits. 120 S.Ct. at 704. Requiring the plaintiff to show actual environmental harm as a condition for standing confuses the jurisdictional inquiry (does the court have power under Article III to hear the case?) with the merits inquiry (did the defendant violate the law?).

Second, *Laidlaw* recognized that an increased risk of harm can itself be injury in fact sufficient for standing. The "irreducible constitutional minimum" conditions for standing do not require a plaintiff to demonstrate that she has already suffered physical injury, but allow her to obtain standing based on an injury that is "imminent, not conjectural or hypothetical." *Laidlaw,* 120 S.Ct. at 704 (quoting *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130); *see also Gaston Copper,* 204 F.3d at 160. In the wake of *Laidlaw,* for example, the en banc Fourth Circuit held that an affiant sufficiently alleged injury in fact under the Clean Water Act when the defendant's alleged NPDES permit violations *threatened* the environmental quality of waters adjoining the affiant's property, although the plaintiff environmental organizations had not produced evidence of actual environmental degradation. *Gaston Copper,* 204 F.3d at 155–61. As the *Gaston Copper* court cogently explained, to require actual evidence of environmental harm, rather than an increased risk based on a violation of the statute, misunderstands the nature of environmental harm, and would undermine enforcement of the Clean Water Act:

> The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements.... Threatened environmental injury is by nature probabilistic. And yet other circuits have had no trouble understanding the injurious nature of risk itself.... [A plaintiff] need not wait until his lake becomes barren and sterile or assumes· an unpleasant color and smell before he can

nothing more. 432 U.S. at 343, 97 S.Ct. 2434.

invoke the protections of the Clean Water Act.

*Id.* at 160 (internal citations omitted).

Mateel and ERF have clearly alleged that Pacific Lumber has violated conditions of its NPDES permits at Yager Camp and Carlotta.[11] Hinderyckx and Evenson have demonstrated that Pacific Lumber's alleged conduct has impaired their aesthetic and recreational interests in Yager Creek. Each has averred that he enjoys the area less than he otherwise would, and is reluctant to swim and fish there, because of concerns about the effects of pollutant discharges from Pacific Lumber's facilities adjoining the creek. They need not prove to a scientific certainty that Pacific Lumber has, in fact, discharged pollutants in violation of its permits *in order to obtain standing;* this, as just explained, is one of the merits questions in the case.

■■■■■ Pacific Lumber further argues that the plaintiffs have failed to demonstrate that their asserted injuries are fairly traceable to any conduct by the company. We disagree. The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court. *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct.

1917, 48 L.Ed.2d 450 (1976)); *cf. American Petroleum Institute v. United States EPA,* 216 F.3d 50, 66–68 (D.C.Cir.2000) (plaintiffs failed to show causation in challenge to EPA rule governing hazardous wastes where their asserted injury relied on speculation that particular facilities would actually introduce the pollutants into the air).[12] Thus, the causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits. *See, e.g., Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 72 (3d Cir.1990).

Hinderyckx and Evenson have claimed that their enjoyment of various activities they take part in on Yager Creek and waterways downstream is lessened due to Pacific Lumber's alleged violations of various provisions of the Clean Water Act designed precisely to prevent the irreparable environmental degradation of the nation's waters before it occurs. It requires no attenuated chain of conjecture, and no presumptions that other actors will behave in any particular way, to link Pacific Lumber's alleged illegal conduct to Hinderyckx's and Evenson's diminished enjoyment of Yager Creek. Therefore, we conclude that Hinderyckx and Evenson

**11.** Pacific Lumber has argued that the plaintiffs did not claim that the company was discharging pollutants in violation of its NPDES permit. Appellee's Ans. Brf. at 19 n. 10. This assertion is puzzling, because both complaints at issue in this case do, in fact, allege various discharges of pollutants in violation of the General Permit at the Carlotta Mill (First Amd. Cplt. at 13; Cplt. at 10–11) and Yager Camp (First Amd. Cplt. at 18; Cplt. at 16–17), in addition to many other violations of permit conditions.

**12.** *American Petroleum* concerned a direct challenge to an EPA regulation exempting several specific pollutants from being classified as hazardous wastes under the Resource Conservation and Recovery Act. 216 F.3d at 62. In that context, it was important to the

standing inquiry that the asserted pollution be fairly traceable both to the substances covered by the challenged regulation, and not to some other pollutants, and to the facilities that the plaintiffs complained about. *Id.* at 65–68. The plaintiffs' failure to show the actual or imminent presence of those specific substances, coupled with mere speculation that particular facilities would actually release those substances, was therefore fatal to their bid for standing. The Clean Water Act, in contrast, not only regulates actual water pollution, but embodies a range of prophylactic, procedural rules designed to reduce the risk of pollution. It is not necessary for a plaintiff challenging violations of rules designed to reduce the *risk* of pollution to show the presence of *actual* pollution in order to obtain standing.

have satisfied the causation element of Article III standing.

## III.

### Other Asserted Bases for Affirmance

Pacific Lumber suggests that even if we disagree, as we do, with the district court's grant of summary judgment in its favor on standing grounds, we should for other reasons affirm the district court's dismissal of the case. *See, e.g., First Pacific Bank v. Gilleran,* 40 F.3d 1023, 1024–25 (9th Cir. 1994) (district court judgment may be affirmed on any ground supported by the record). Specifically, Pacific Lumber maintains, first, that the case became moot when the 1997 General Permit went into effect six months after the plaintiffs filed their complaint based on the 1992 General Permit, and second, that the plaintiffs' Yager Camp 60–day notice letter was defective. Neither of these contentions, however, would justify the dismissal of the entire case.

■■ As to the first, new permit issue: Even if the plaintiffs' claims for injunctive or declaratory relief for violations of the earlier General Permit became moot when the 1997 General Permit went into effect— an issue we do not decide—the plaintiffs' claims for civil penalties and attorneys' fees would remain viable. *See Laidlaw,* 120 S.Ct. at 706–10; *Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979, 990 (9th Cir.1995) (changes to defendant's NPDES permit did not moot claims for attorney's fees based on alleged violations of old permit).

■ An action becomes moot if the controversy is no longer live because an event occurs that precludes the court from ordering effective relief, a circumstance that is not before us. *American Rivers v. National Marine Fisheries Serv.,* 126 F.3d 1118, 1123 (9th Cir.1997). The district court retained subject matter jurisdiction in this case whether or not the alleged violations persist throughout the duration of the litigation, because Mateel and ERF alleged violations of the Clean Water Act that were ongoing at the time the com-

plaint was filed. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Therefore, we cannot say that the controversy as regards Pacific Lumber's violations of the 1992 General Permit are no longer live even if the plaintiffs have not properly claimed violations of the 1997 General Permit, as long as effective relief is possible.

There is no reason the district court could not order effective relief in this case. As is ordinarily the case with monetary relief, liability for civil penalties under the Clean Water Act attaches at the time the violations occur, not at the time of the judgment. *See* 33 U.S.C. § 1319(d) ("Any person who violates [various sections of the Clean Water Act or permits issued under the Act] shall be subject to a civil penalty not to exceed $25,000 per day for each violation."). Further, such monetary penalties continue to fulfill their purpose after the issuance of a new permit: Civil penalties deter future violations of the Clean Water Act even when injunctive relief is inappropriate. *See Laidlaw,* 120 S.Ct. at 706 ("civil penalties in Clean Water Act cases do more than promote immediate compliance ...; they also deter future violations"); *id.* at 710. Monetary penalties can serve their general deterrent function as well now that Pacific Lumber's discharges are regulated under a new, stricter permit as they could under the old permit. The underlying statutory rule appellants seek to enforce in this case precludes any discharges except in compliance with an applicable permit. 33 U.S.C. § 1311(a). There is no basis for believing that the bare fact of a new, stricter permit makes future permit violations any less likely, deterrence any less necessary, or the deterrent effect of civil penalties any less potent. We must conclude that civil penalties, if appropriate on the merits, would serve their deterrent purpose in this case.

■ Nor does Pacific Lumber's claim that the Yager Camp 60–day notice letter

was inadequate, even if correct (again, an issue we do not address), provide a reason for affirming the district court's judgment of dismissal. Pacific Lumber has not argued that the plaintiffs' notice letter pertaining to the Carlotta mill is, with respect to alleged violations of the 1992 General Permit, in any way deficient. Consequently, Pacific Lumber's allegation regarding the 60–day notice requirement could, at most, support striking the parts of plaintiffs' complaint pertaining to the Yager facility; the case could still go forward with respect to the alleged violations of the 1992 General Permit at Carlotta.

We cannot, therefore, affirm the district court's outright dismissal of the plaintiffs' lawsuit on the basis of Pacific Lumber's alternative arguments. Under these circumstances, it would be entirely improper for us to address those arguments any more extensively than we have, for two reasons.

First, the rule that a case may be affirmed on any ground supported by the record is one driven by efficiency considerations. Where precisely the same result could have been reached on other grounds apparent from the record, sending the case back to the district court is wasteful both for the courts and for the litigants. *See SEC v. Chenery*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

At the same time, the affirm-on-any-ground rule does disregard the usual relationship between trial and appellate courts. Usually, an appellate court does not consider legal issues in the first instance but instead has the benefit of the district judge's initial analysis. Our judicial system generally assumes that consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result, because the issue will be more fully aired and analyzed by the parties, because more judges will consider it, and because trial judges often bring a perspective to an issue different from that of appellate judges. It is to assure two-level consideration that issues usually cannot be raised in appellate courts in the

first instance, but instead are waived (or reviewed only for plain error) if not raised before the district court. *See, e.g., In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir.1989) (issue is waived on appeal unless it was raised below "sufficiently for the trial court to rule on it"). When the efficiency interest no longer obtains because the case will have to be remanded in any event, there is no reason to forego the usual preference for prior trial court consideration of all issues in a case.

Second, to decide Pacific Lumber's alternative arguments at this juncture would be tantamount to allowing an interlocutory appeal of those issues. As noted above, Pacific Lumber's arguments would, at most, support narrowing this case, not dismissing it. Consequently, had the district court correctly decided the standing issue in this case and then turned to Pacific Lumber's alternative arguments, the losing party could not have taken an appeal to this court from the court's decision on those questions until final judgment issued in the case as a whole. *See* 28 U.S.C. § 1291. Nor would we have the power to hear a premature appeal on those questions. *Id.* Just as there is no reason to alter the usual division of initial responsibility between the trial and appellate courts because a threshold, potentially dispositive issue was decided incorrectly, so there is no ground for allowing otherwise unavailable appellate consideration of non-dispositive issues for that reason.

Rather than adjudicating this case piecemeal, we reverse on the standing issue and remand to allow the district court to adjudicate all the issues in the case in the first instance.

**REVERSED AND REMANDED** for proceedings consistent with this opinion.