Michael A. BALDWIN; Constance J. Baldwin, husband and wife, and the marital community composed thereof, Plaintiffs–Appellants,

v.

TRAILER INNS, INC., a corporation registered in the state of Washington; Don Kramer, Defendants–Appellees.

No. 00–35412.

United States Court of Appeals, Ninth Circuit.

Argued March 5, 2001

Submitted April 26, 2001

Filed Sept. 20, 2001

Paul H. King, Seattle, Washington, for the plaintiffs-appellants.

Gary E. Lofland, Lofland and Associates, Yakima, Washington, for the defendants-appellees.

Before: PREGERSON, THOMAS, and GOULD, Circuit Judges.

RONALD M. GOULD, Circuit Judge:

Appellants, husband and wife Michael A. Baldwin and Constance J. Baldwin (the "Baldwins"), were managers of Appellee Trailer Inns, Inc.'s recreational vehicle ("RV") park in Bellevue, Washington. The Baldwins seek overtime wages from Trailer Inns, Inc. and its president, Don Kramer (collectively, "Trailer Inns") under the Fair Labor Standards Act ("FLSA") and damages resulting from the alleged breach of their employment agreement with Trailer Inns, Inc. The Baldwins appeal the district court's grant of two motions for partial summary judgment in favor of Trailer Inns. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part on the FLSA claim and reverse in part on the breach of contract claim.

## FACTS AND PROCEDURAL HISTORY

Trailer Inns, Inc. is a Washington corporation, headquartered in Yakima, that owns and operates RV parks in Bellevue, Spokane, and Yakima, Washington. The Bellevue park (the "park") has space for up to 104 RV's. The facilities for guests include an office, pool, showers, restrooms, recreation room, barbeque, and a picnic area.

Trailer Inns, Inc. typically hires a husband and wife to manage the park. The managers are required to live in an apartment located in the park, which is provided as part of the managers' compensation. The managers are helped by assistant managers, also a couple, who reside in the park in a RV.

Pursuant to an assistant manager's contract, the Baldwins began working as assistant managers at the park on July 30, 1997. The contract included an addendum requiring that the Baldwins participate in a one-month assistant manager on-site training program at a joint salary of $1,500 "to learn owner's proven techniques and standards and methods of management with regard to Owner recreational vehicle facility." The training addendum also includes a job description: "Manages and maintains recreational park; shows, rents or assigns space(s), registers guests, collects rent and records data pertaining to rent funds and expenditures...." The addendum concludes by outlining cleaning, maintenance, and repair responsibilities. Upon completion of the training, the contract called for the Baldwins to earn a joint salary of $1,900 per month.

The Baldwins completed the one-month training as assistant managers on August 26, 1997, and began work as assistant managers.

On September 9, 1997, the Baldwins entered into another employment agreement (the "agreement") with Trailer Inns, Inc., giving the Baldwins, as the park's "Management Team," "general management authority with respect" to the park. The agreement states that previous agreements between the contracting parties "are mutually rescinded, canceled, and annulled." The agreement calls for the Management Team to ensure that all park

employees appear "neat and clean" and "maintain a professional demeanor"; makes the Management Team responsible for the general day-to-day maintenance of the park's facilities, maintaining supply and spare parts inventories, and promoting the business of the owner; and requires the Management Team to oversee the work of assistant managers, deal with the customers, handle the park's paperwork and accounting, and perform manual labor related to the cleaning, maintenance, and repair of the park. The agreement also requires the managers to be on-call twenty-four hours a day, seven days a week, and requires a manager to be on-site unless an assistant manager is on duty. The agreement sets the Baldwins' joint salary at $2,400 per month in addition to on-site apartment housing.

An addendum to the agreement requires the Management Team to enroll in a one-month training period at a joint salary of $1,900 a month. The first three paragraphs of the addendum are essentially identical to the provisions in the training addendum to the assistant manager's contract, except for the differences in salary and benefits. Additional supervisory responsibilities are outlined in the Management Team's job description, including "Schedules duties and examines work for exactness.... Prepares work schedules and expedites workflow. Issues written and oral instructions, purchase's [sic] supplies and arranges for outside services." The addendum includes an additional bolded paragraph that provides:

> **The Manager's (women's) primary duties are to handle the office, customer service and to keep the building clean and maintained. The Manager's (Man's) primary duties is [sic] to keep the building and outside grounds clean and well maintained and to help in the office and customer service.**

The agreement also calls for a "Revised Bonus & Profit Share Program," provided that the Management Team "remain as Managers for at least one (1) year after completing the one-month training program." Receipt of bonus compensation is also conditioned on the Management Team meeting the performance standards set out in the attached "Manager's Checklist."

Constance Baldwin states that before signing the agreement on September 9, 1997, she had a conversation with Kramer, the owner, that led her to believe that the Baldwins' one-month training requirement as managers was satisfied by the one-month training as assistant managers that the Baldwins had completed about two weeks earlier. The Baldwins were paid $1,900 for their work in September, 1997. The previous Management Team, Del and Lisa Moser, continued working at the park until the beginning of October, 1997. In October, 1997, the Baldwins began earning $2,400 jointly a month.

The agreement calls for a monthly inspection of the park conducted by Trailer Inns, Inc.'s owner or an owner's representative. During the Baldwins' tenure as park managers, Kramer visited the park only once or twice per month. The agreement also provides that the inspector use the Manager's Checklist to evaluate the Management Team's performance in managing and maintaining the park and grants the owner power to deduct pay for deficient job performance.

Trailer Inns, Inc. also used daily, weekly, and monthly checklists to ensure the completion of tasks. Kramer states that "the lists do not designate who was to do what task. The assignment and/or allocation of those tasks was the responsibility of the manager."

In the year of the Baldwins' employment under the manager's agreement, three sets of assistant managers worked at the park:

(1) Lance Mayo and Cindy Shiery from October 1, 1997 to January 8, 1998; (2) Jock and Shirley McGreggor from January 31, 1998 to May 12, 1998; and (3) Martin Hoage and Margarete DeLozier from May 12, 1998, through the end of the Baldwins' employment. Like the Baldwins' contract, the assistant manager's contract of Mayo and Shiery called for a $1,900 salary. Hoage and DeLozier's contract called for $1,700 salary with job performance incentives allowing for a maximum monthly bonus of $200.

Kramer states that the Baldwins conducted initial interviews of the assistant manager candidates, and Kramer would conduct the subsequent interviews. Kramer also states that the Baldwins were responsible for training, evaluating, and disciplining assistant managers. The Baldwins admit to training all three sets of assistant managers. The Baldwins completed a training checklist for Lance Mayo and Cindy Shiery and, at the conclusion of the training, completed written evaluations of them.[1] The Baldwins also issued a written evaluation of the McGreggors' work upon their departure from the park, which was not related to their performance.

Kramer states that the Baldwins recommended termination of the first set of assistant managers. The Baldwins wrote a termination letter to Lance Mayo and Cindy Shiery on January 8, 1998. The Baldwins state that when Kramer "made a personnel decision, he then directed us on what exactly to do, he dictated the letter by which he ended their employment, all we did was follow his directions precisely." Kramer asserts that the Baldwins hired additional part-time workers for care and maintenance of the park. The record indicates that on at least two occasions, the

Baldwins hired additional part-time workers.

The park's winter 1997–98 schedule indicates that the managers were scheduled to work forty-two hours per week. Managers were not scheduled to work Sundays and Mondays, and assistant managers were not scheduled to work Wednesdays and Thursdays. On Tuesdays, Fridays, and Saturdays, each manager was scheduled to spend between two and four-and-one-half hours per week working the same shifts as an assistant manager. The summer schedule indicates a forty-three hour workweek for managers, and during the three days when both managers and assistant managers were both scheduled to work, there was no scheduled overlap between the shifts of managers and assistant managers.

The Baldwins state that as managers: (1) they spent more than forty hours per week to complete their tasks; and (2) the managers and assistant managers performed essentially the same tasks, primarily manual labor. The Baldwins also state that their administrative and supervisory tasks were limited and mainly involved signing up new tenants, collecting and recording rent payments, accounting, and other paperwork.

The Baldwins further claim that when training assistant managers Mayo and Shiery in October, 1997, they each worked their own manager's schedule of 200 hours per month and the assistant manager's schedule of 176 hours per month. Daily worksheets, weekly to do sheets, and monthly records and checklists of work completed indicate that both managers and assistant managers performed many manual tasks of cleaning, maintenance, and

---

1. Kramer states, and the Baldwins do not dispute, that the Baldwins also completed a written evaluation of the McGreggors upon completion of their training. However, the McGreggors' personnel records were lost.

repair, but do not indicate the total hours spent on each task.

On May 8, 1998, giving 120 days notice as required by the agreement, the Baldwins submitted to Kramer a resignation letter effective September 9, 1998. The Baldwins state that when Kramer received the resignation letter, he approached Michael Baldwin seeking reassurance that the Baldwins would remain as managers until September 9, 1998. Michael Baldwin states that he told Kramer he intended to honor his commitment to stay, and that Kramer assured him that the Baldwins would be eligible for a bonus provided they stayed until the date and an audit of the park's records worked out all right. The Baldwins also state that on numerous other occasions subsequent to this visit, Kramer reassured them that they would receive a bonus provided the audit was satisfactory.

The Baldwins stopped working at the park on September 8, 1998, and about a month later, were informed by Kramer that they were ineligible for a bonus because they did not work a full year as managers after completing the one-month training period.

On December 17, 1998, the Baldwins filed a complaint against Trailer Inns in the United States District Court for the Western District of Washington claiming (1) overtime wages under the FLSA; (2) minimum wages under the FLSA; and (3) breach of contract for failing to pay the Baldwins' performance bonus.

The Baldwins moved for partial summary judgment on the FLSA claims. Trailer Inns filed a cross motion for partial summary judgment asserting the affirmative defense that the Baldwins were exempt executive employees under the FLSA. Trailer Inns moved for partial sum-

mary judgment on the Baldwins' claim for breach of contract. The Baldwins filed a cross motion for partial summary judgment on the contract claim. On November 15, 1999, the district court entered: (1) an order granting Trailer Inns' cross motion for partial summary judgment on the Baldwins' claims for overtime and minimum wages earned after September 9, 1997; and (2) an order granting Trailer Inns' motion for summary judgment on the contract claim. The Baldwins' claims for overtime and minimum wages earned before September 9, 1997, was later settled by the parties. On April 3, 2000, the district court entered its judgment, and the Baldwins appeal.

## DISCUSSION

 We review a grant of summary judgment de novo. *Botosan v. Paul McNally Realty,* 216 F.3d 827, 830 (9th Cir.2000). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *Adcock v. Chrysler Corp.,* 166 F.3d 1290, 1292 (9th Cir.1999). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

We address the district court grant of summary judgment concerning: (1) the Baldwins' overtime claims under the FLSA; and (2) the Baldwins' contract claim.

### I. The FLSA

 We first address the Baldwins' overtime claims under the FLSA, 29 U.S.C. §§ 201–219.[2] The FLSA requires

2. The Baldwins also assert, but do not devel-

op, a claim under overtime provisions in

that employers ordinarily pay their employees time and one-half for work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The FLSA provides an exemption from overtime for persons "employed in a bona fide executive, administrative, or professional capacity" and grants the Secretary of Labor broad authority to promulgate regulations to "define[ ] and delimit[ ]" the scope of the exemption. 29 U.S.C. § 213(a)(1). It is the burden of an employer to show entitlement to an exemption from the FLSA. *Donovan v. Nekton, Inc.*, 703 F.2d 1148, 1151 (9th Cir.1983) (per curiam). We explained in *Klem v. County of Santa Clara*, 208 F.3d 1085 (9th Cir.2000), that the FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction. To that end, FLSA exemptions are to be narrowly construed against . . . employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit." *Id.* at 1089 (internal quotation marks and citations omitted).

The Baldwins claim that Trailer Inns owes them overtime because their employment at the park exceeded forty hours per week, amounting to 2,151 uncompensated hours over the course of their employment.[3] Trailer Inns responds that the Baldwins are exempt executives under the FLSA, and we agree.

To prove the Baldwins are exempt from overtime pay, Trailer Inns must establish that the Baldwins' employment meets the requirements of the executive exemption "short test" set forth in the Department of Labor ("DOL") regulations:[4] (1) the Baldwins are paid on a "salary basis"; (2) the Baldwins are paid "at a rate of not less than $250 per week . . . exclusive of board, lodging, or other facilities"; (3) the Baldwins' "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department of [sic] subdivision thereof"; and (4) the Baldwins' primary duty "includes the customary and regular direction of the work of two or more other employees." 29 C.F.R. § 541.1(f). *See also* 29 C.F.R. § 541.119(a).

The parties do not dispute that Trailer Inns paid the Baldwins on a "salary basis" as defined by the regulations. *See* 29 C.F.R. § 541.118(a). The second requirement of the test is also satisfied because

---

Washington State's Minimum Wage Act ("MWA"). *See* Wash.Rev.Code § 49.46.130. In its order, the district court referred to the Baldwins' "action seeking . . . overtime wages under the FLSA and a related Washington statute for their work." We do not consider the Baldwins' MWA claim because they did not plead the MWA in their complaint, the district court did not discuss Washington wage law beyond the passing reference cited above, and the MWA claim is not developed here beyond citation to the code provision. *See Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1154 (9th Cir.2000) (an issue is generally waived on appeal if it is not adequately raised below to the district court). The Baldwins did plead a federal minimum wage violation under 29 U.S.C. § 206(a). However, they do not raise the issue here, and we consider it waived. *See*

*Paciulan v. George*, 229 F.3d 1226, 1230 (9th Cir.2000) (an issue not contained in an opening appellate brief may be considered waived).

3. The Baldwins estimate that over the thirteen months from July 29, 1997 to September 8, 1998 they worked 6,905 hours, 2,151 hours more than required for a forty hour workweek. This estimate includes, in part, the settled overtime claims from July 29, 1997–September 8, 1997.

4. We give deference to the DOL's regulations interpreting the FLSA. *Auer v. Robbins*, 519 U.S. 452, 457, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070–71 (9th Cir.1990).

the Baldwins' joint salary of $2,400 per month exclusive of benefits amounts to $276.92 per week for each manager and exceeds the $250 per week requirement.[5] To establish an exemption from overtime, Trailer Inns must demonstrate that the Baldwins' employment satisfied the last two short test requirements known as the "duties test." We address both the primary duty and supervisory prongs of the duties test.

### A. Primary Duty

The district court concluded that despite the fact that the Baldwins claimed that they spent ninety percent of their time on nonexempt tasks, other relevant factors established that the Baldwins' primary duty was management of the park. Giving the Baldwins, as the party against whom summary judgment was granted, the benefit of all factual disputes and reasonable inferences, we conclude that Trailer Inns has established that management was the Baldwins' primary duty.

We have previously analyzed the primary duty component of the duties test. See Barner v. City of Novato, 17 F.3d 1256, 1260–62 (9th Cir.1994); Wainscoat v. Reynolds Elec. & Eng'g. Co., Inc., 471 F.2d 1157, 1161 (9th Cir.1973). However, we have not addressed the primary duty requirement where, as here, less than fifty percent of an employee's time was spent on exempt work.

The relevant DOL regulation provides, in pertinent part:

A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103.

We consider the time the Baldwins spent on management duties and the other pertinent factors listed above.

### 1. Time Spent on Management Duties

The Baldwins claim that they spent ninety percent of their time on nonexempt duties. The Baldwins present the following evidence: (1) their declarations attesting to a considerable amount of overtime labor with the vast majority of the their

**5.** The Baldwins contend in their reply brief that they were paid at a combined monthly rate of only $1,900 or $221.67 each week for the first thirty days of the agreement and, for that period, their exempt status is subject to the more stringent executive exemption "long test." See 29 C.F.R. § 541.1(c)-(e). We do not consider this issue because it was not raised in district court or contained in the Baldwins' opening brief. See Ecological Rights Found., 230 F.3d at 1154.

workweek spent on manual labor; (2) the list of manual labor responsibilities outlined in the agreement including cleaning, maintenance, and repair of the park's facilities; and (3) checklists and worksheets indicating the Baldwins' regular completion of manual work.

Under the FLSA's regulations, the maintenance and cleaning of the park is classified as nonexempt work. *See* 29 C.F.R. § 541.102.[6] However, the interviewing, selecting and training of employees; setting hours for and planning and directing work; evaluating and disciplining employees; and maintaining the safety of the employees and the park are all exempt activities. *See id.*

We must accept on summary judgment the Baldwins' assertion, supported by the record, that they spent more than fifty percent of the time on manual tasks that are plainly nonexempt. In interpreting the primary duty requirement, although the percentage of time spent on nonexempt tasks is relevant, it is not alone dispositive. 29 C.F.R. § 541.103. We do not presume that the executive exemption fails merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks, and the man-

agement function cannot readily and economically be separated from the nonexempt tasks. *Cf. Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir.1982) (*"Burger King I"*) (in concluding that Burger King assistant managers had management as their primary duty, the court reasoned that "a strict time division is somewhat misleading here: one can still be 'managing' if one is in charge, even while physically doing something else. The 50 percent rule seems better directed at situations where the employee's management and non-management functions are more clearly severable than they are here.").

Therefore, we will weigh the other considerations listed in § 541.103 and the facts unique to this case to determine whether the Baldwins' primary duty was management.

### 2. *Relative importance of managerial duties*

The relative importance of the Baldwins' managerial duties compared to their nonexempt duties supports the exemption. The agreement and evidence from the record support the district court's conclusion that the Baldwins "were in charge of making the relatively important day-to-day de-

---

**6.** The applicable regulation states:

(a) In the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

(b) For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their

work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102.

cisions of the facility and providing for the safety of those in the property." The Baldwins were on-call twenty-four hours a day to handle emergencies and to exercise their managerial discretion. In Kramer's general absence, someone had to manage the park. That task fell to the Baldwins and no one else.

The Baldwins argue that they spent the majority of their time performing the same tasks as the assistant managers, and that the "real purpose" of the assistant managers was to allow the managers to take some time off. That the assistant managers may have performed some managerial tasks does not render the tasks nonexempt. *Murray v. Stuckey's Inc.*, 939 F.2d 614, 619 (8th Cir.1991) (concluding that it was irrelevant to the primary duty inquiry "whether other employees who reported to the manager were capable of performing part or even all of the manager's duties"). Also, that the Baldwins performed some of the same tasks as their subordinates is not in and of itself evidence that the Baldwins do not qualify for the exemption. *See Barner*, 17 F.3d at 1260–61; *Wainscoat*, 471 F.2d at 1161. The Baldwins' principal value to Trailer Inns was directing the day-to-day operations of the park even though they performed a substantial amount of manual labor. *See Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ("At least under the short tests, the employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time.") (footnotes omitted).

### 3. *Frequency of exercise of discretionary powers*

The Baldwins frequently had the opportunity to exercise discretionary powers in their management of the park. They man-aged the park without much participation or interference from Trailer Inns,. Inc.'s Yakima headquarters. The Baldwins' oversight of employees, their responsibilities for the implementation of corporate policies, and their status as the owner's on-site representative are properly considered discretionary tasks. The Baldwins ran the park and handled problems as they arose.

### 4. *Relative freedom from supervision*

That the Baldwins were free from daily supervision by Trailer Inns, Inc. weighs heavily in favor of the exemption. Kramer visited the park once or twice a month, and there was no constant oversight from Trailer Inns, Inc. The Baldwins had to adhere to company policies, record completed tasks on checklists, and were subject to performance reviews conducted through a monthly inspection by Trailer Inns, Inc. However, in practice, the oversight was neither so rigorous nor so frequent as to undermine the undeniable fact that the Baldwins were substantially free from supervision, and the existence of checklists to monitor their work does not alter our conclusion. *See Burger King I*, 672 F.2d at 223, 226 (concluding that assistant managers whose tasks were "governed by highly detailed, step-by-step instructions contained in" the company manual that "admit of little or no variation" had management as their primary duty).

### 5. *Relationship between salary and wages paid other employees*

The relationship between the Baldwins' salary and the wages paid to the assistant managers supports an exemption. As managers, the Baldwins $2,400 managers' salary was at least $500, or $250 per person, more per month than the assistant managers's base salary of either $1,700 or $1,900. The difference in compensation

was greater because the Baldwins lived in an on-site apartment provided by the park that was of greater value than the RV that housed the assistant managers, and the Baldwins were eligible for bonus compensation provided they worked at least one year at the park.[7]

The Baldwins argue that the short test requires that managers have either the authority to hire or fire other employers or that their suggestions and recommendations on hiring or firing and advancement of employees are given particular weight. 29 C.F.R. § 541.1(c). This is a separate requirement only under the long test, see 29 C.F.R. § 541.119(a), not under the short test. The district correctly considered this factor solely in determining the extent of the Baldwins' management responsibilities.

The district court concluded that the Baldwins conducted initial interviews, had the power to "recommend and execute the decision of hiring or firing an employee" with Kramer's consent, and that the Baldwins recommended the firing of assistant managers Mayo and Shiery. While there may be a dispute on the extent of the Baldwins' influence on Kramer's hiring and firing, the district court's factual conclusions are supported by the record even when giving adverse inferences to the Baldwins. Weight is also properly given to this factor because the Baldwins hired part-time laborers to do maintenance work at the park on at least two occasions.

The Baldwins' employment meets the primary duty requirement of the executive exemption because the Baldwins had authority and discretion to manage the park on a day-to-day basis without supervision and control from Trailer Inns, Inc.[8]

## B. Supervising Two or More Employees

 To qualify for the executive exemption, the Baldwins must customarily and regularly direct the work of two or more other employees. 29 C.F.R. § 541.1(f). DOL regulations interpret "customarily and regularly" to indicate a frequency that must be greater than occasional but that may be less than constant. 29 C.F.R. § 541.107(b). Except for three weeks in January, 1998, assistant managers were employed at the park during the Baldwins' employment as managers. The district court concluded that the Baldwins met the supervisory prong of the duties test because under the terms of the agreement, the Baldwins were responsible for training the assistant managers, ensuring their compliance with policies and proce-

---

7. While one set of assistant managers was eligible for performance-linked bonus compensation, the bonus could merely elevate their monthly salary from $1,700 to $1,900.

8. Our conclusion is consistent with Donovan v. Burger King Corp., 675 F.2d 516 (2d Cir. 1982) ("Burger King II") where the court found that Burger King assistant managers were exempt as executives under the short test even though the majority of their time spent on nonexempt tasks because: (1) the restaurants could not have operated successfully unless the assistant managers performed their managerial functions; (2) the assistant managers exercised discretion while performing their managerial functions; (3) the assistant managers were solely in charge of the restaurants most of the time; and (4) the assistant managers were paid substantially higher wages than the nonexempt workers. Id. at 520–21. See also Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1144–47 (3d Cir.1983) (concluding under the short test that the primary duty of coal mine foremen was management because of their safety and supervisory responsibilities and their independence from regular supervision despite that fact that the foremen (1) spent, on average, less than fifty percent of their time on management duties; (2) did not frequently exercise discretion; and (3) received a salary only marginally higher than that of the crew members).

dures, and reporting their hours worked every two weeks; the Baldwins evaluated the work of assistant managers; and the Baldwins recommended firing assistant managers in one instance. We agree.

The Baldwins contend that the training is not supervision for purposes of the FLSA because their direction only amounted to correcting the assistant managers' mistakes and ensuring their compliance with company policy outlined in a manual. However, ensuring employee compliance with a management manual qualifies as supervision for the purposes of the regulations. *See Burger King I,* 672 F.2d at 226 ("The fact that Burger King has well-defined policies, and that tasks are spelled out in great detail, is insufficient to negate this conclusion. Ensuring that company policies are carried out constitutes the very essence of supervisory work.") (internal quotation marks omitted).

The Baldwins further assert that the only time they directed the work of the assistant managers was during the two to four week training periods. However, this training is not all that the Baldwins did. They also supervised the assistant managers.

The Baldwins further assert that, other than during training, they did not supervise the assistant managers because the agreement did not require managers to be on-site simultaneously with the assistant managers; the managers and the assistant managers worked at non-overlapping times; and the "real purpose" of the assistant managers was to allow the managers some time off. We disagree. The Baldwins' continuous simultaneous physical presence with the assistant managers is not an essential requirement of supervision as long the Baldwins supervised the assistant managers' work in other ways. *See Sturm v. TOC Retail, Inc.,* 864 F.Supp. 1346, 1354 (M.D.Ga.1994) (concluding that

a convenience store manager need not be physically present to supervise other employees where the manager scheduled work shift of subordinates, were on-call to address problems, and reviewed the workers' shift performance).

Here, additional factors showed supervision. The agreement calls for the Baldwins to oversee the performance of the assistant managers. There is no indication that the assistant managers were regularly supervised by Trailer Inns, Inc.'s headquarters or anyone else except the Baldwins. The Baldwins divided work responsibilities among the managers and the assistant managers, were on-call to respond to problems, and made sure that the assistant managers completed their responsibilities and complied with management policy.

The Baldwins supervision meets the requirements of the executive exemption.

## II. Breach of Contract

The Baldwins argue that it was the intention of the parties in signing the agreement to have the assistant manager's training program that the Baldwins completed on August 26, 1997, satisfy the agreement's requirement of one month of management training. The district court disagreed and concluded that the Baldwins' interpretation of the provision was not reasonable given the agreement's language and the extrinsic evidence. The district court was urged by both parties to grant summary judgment on this contract breach issue. Both parties filed cross-motions for summary judgment, and asserted that there were no genuine issues of material fact preventing summary judgment in their favor. Nonetheless, each summary judgment motion had to be considered with all reasonable inferences favoring the nonmoving party. In this procedural light, we conclude the district

court should not have granted summary judgment for Trailer Inns on the contract breach claim of the Baldwins at this stage.

The agreement provides that its terms should be governed by Washington law. Washington law instructs the court in interpreting a written agreement to ascertain and to give effect to the intentions of the parties. *Matter of Hollingsworth's Estate*, 88 Wash.2d 322, 560 P.2d 348, 350–51 (1977). If the intention is clear, courts "must be governed by the intention of the parties as expressed in their written instrument." *Id.* at 351. The introduction of extrinsic evidence is permitted to determine the intention of the contracting parties even in the absence of ambiguity of the contract language so long as the evidence is not used to "add to, subtract from, vary, or contradict" contracts which are "not affected by accident, fraud, or mistake." *Berg v. Hudesman*, 115 Wash.2d 657, 801 P.2d 222, 230 (1990).

The court can consider a broad scope of the extrinsic evidence to discover intent under the "context rule":

> In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement, but also from "viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties."

*Scott Galvanizing, Inc. v. N.W. Enviro-Services, Inc.*, 120 Wash.2d 573, 844 P.2d 428, 432 (1993) (quoting *Berg*, 801 P.2d at 228).

Under the management contract executed on September 9, 1997, after one month of management team training, and a year of service as managers, the Baldwins were to have a bonus. The Baldwins claim their prior training counted for this and their service as managers started in September 1997, giving them a right to bonus when they left a year later. Trailer Inns claims that the Baldwins previously trained as assistant managers under the initial contract and that their time in September 1997 was in training as managers, so that they failed to complete a year of service as managers necessary for a bonus.

No doubt a close question is presented here, and we have concluded that it is better resolved only after hearing and fact-finding. Notably, on August 28, 1997, Don Kramer of Trailer Inns told the Baldwins that he had decided to make them managers. Nothing in the management team contract executed September 9, 1997, indicates that it was not to be effective in providing this new role for the Baldwins until October 1997. The record in our view is not crystal clear on whether the Baldwins in September 1997 were acting as managers or as assistant managers. Viewed in this way, neither party can prevail on a summary judgment for breach of contract with this record. It will be necessary for the district court to permit a hearing and to make factual determinations resolving the contract breach issue.

We acknowledge that there is little ambiguity in the text or structure of the agreement itself. The agreement calls for the Management Team to enroll in an on-site training program for one month at a joint salary of $1,900. The agreement expressly requires a full year of employment as managers following a one month training program to be eligible for the bonus. What is unclear, at least when all inferences are given to the Baldwins, is whether their prior training counts.

The Baldwins argue that Kramer's actions before and after the signing of the

agreement showed that his intention in signing the agreement was not to require additional management training. Constance Baldwin recounts the following conversation directly before she and her husband signed the agreement:

> I asked [Kramer] one question about the Agreement. On page 1, there is Paragraph 2, "TRAINING", and the monthly salary figure of $1,900.00. I asked, "What is this?" Don said, "Isn't that what you earned last month for training?" "Yes." I answered. "Well, this contract replaces the first one." I understood that to mean that all parts of "on the job training" were completed and thought perhaps he had lost the first contract and was just replacing it, by adding it to the current one. Everything I did see under "TRAINING", looked exactly as the first contract and I don't remember anything described differently.... Don further explained that we had to remain at $1,900.00 per month salary until [the current Management Team] Del and Lisa Moser left.

This conversation, if it is proven to have occurred, is not necessarily dispositive, but does materially assist the Baldwins' interpretation of the agreement. And there is no evidence that the Baldwins had separate formal training as managers, apart from their prior training in August. On the other hand, the Baldwins were paid a salary of $1,900, which Trailer Inns urges reflects, per the agreement's terms, the lower compensation provided for the month-long training. But, during that month, the old managers, the Mosers, were still on the payroll and Mrs. Baldwin's testimony gives an alternate view of the significance of the $1,900 payment. The district court in granting summary judgment held that the only reasonable interpretations of the reported conversation, bearing in mind the receipt of the $1,900 salary, was that the Baldwins re-

mained as assistant managers because the Mosers still had not left their positions, or that the Baldwins were managers and in training. But given the inferences favoring the Baldwins in defending a motion for summary judgment, we conclude that it is also at least possible that the Baldwins were acting as managers in September but being paid the lower rate to accommodate Trailer Inns because it was still paying the Mosers. Further, had the September time after execution of the agreement been part of the thirty day training, then such training would have continued until October 8 and their October salary might have been pro-rated with the period through October 8 at the lower rate of $1,900; the record does not show that a pro-rating for part of October occurred.

We reverse the district court's grant of summary judgment for Trailer Inns on the breach of contract claim.

### III. Attorneys' Fees

The Baldwins contend that the district court erroneously awarded attorneys' fees to Trailer Inns. The agreement has a provision calling for the prevailing party to recover attorneys' fees for any "suit or action in connection with any of the terms and provisions of this agreement." Pursuant to this provision, the district court ordered the Baldwins to pay to Trailer Inns attorneys' fees in the amount of $1,050 for prevailing on the contract claim. Because we affirm the district court on the FLSA claims, but reverse on the contract claims, we conclude that attorneys' fees were not properly awarded to Trailer Inns. We therefore reverse the award of such fees to Trailer Inns based on the proceedings through the summary judgment. In view of our rulings, each party shall bear its own costs on this appeal.

### IV. Conclusion

We AFFIRM the district court's grant of summary judgment for Trailer Inns on the FLSA claims, but REVERSE on the breach of contract claims and remand for further proceedings on the contract claims consistent with this opinion. We also REVERSE the award of attorneys' fees and hold that each party shall bear its own costs on this appeal.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**