**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ECOLOGICAL RIGHTS
FOUNDATION,

          *Plaintiff-Appellant*,

v.

PACIFIC GAS & ELECTRIC
COMPANY,

          *Defendant-Appellee.*

No. 15-15424

D.C. No.
3:10-cv-00121-RS

OPINION

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted February 17, 2017
San Francisco, California

Filed November 2, 2017

Before: Marsha S. Berzon and Richard R. Clifton, Circuit
Judges, and Kimberly J. Mueller,[*] District Judge.

Opinion by Judge Berzon

---

[*] The Honorable Kimberly J. Mueller, United States District Judge for
the Eastern District of California, sitting by designation.

## SUMMARY[**]

### Environmental Law

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the Pacific Gas & Electric Company in a citizen suit brought under the Resource Conservation and Recovery Act, seeking to limit PG&E's indirect and direct stormwater discharges of wood treatment chemicals from various of its facilities into San Francisco and Humboldt Bays.

First, the panel held that plaintiff Ecological Rights Foundation had organizational standing to sue PG&E regarding its disposal activities at its Hayward facility.

Reversing in part, the panel held that RCRA's anti-duplication provision, 42 U.S.C. § 6905(a), did not preclude RCRA's application to the stormwater discharges at issue. The Clean Water Act allows but does not require the Environmental Protection Agency to require National Pollution Discharge Elimination permits before such discharges are allowed; EPA has decided not to require permits. The panel held that the language of the anti-duplication provision, its context, and persuasive authorities interpreting the provision required a determination of whether the CWA actually imposed any specific statutory requirements on PG&E's stormwater discharges, and, if so, whether those requirements were inconsistent with any possible remedy under EcoRights' RCRA suit. The panel

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that, because the CWA and its implementing regulations did not require PG&E to obtain a permit for its stormwater discharges, there was no CWA-grounded requirement here imposed, and so none could be inconsistent with the RCRA citizen suit section. The panel further held that PG&E's stormwater discharges were not subject to CWA requirements via the municipal storm sewer system permits required of and held by local government agencies.

The panel affirmed the district court's grant of summary judgment in favor of PG&E on EcoRights' RCRA claim regarding pollutants dispersed by tracking on vehicle tires.

The panel remanded for the district court to consider EcoRights' arguments with respect to the stormwater pathway that the relevant wastes are "solid wastes" and that PG&E's actions present an imminent and substantial endangerment to health or the environment under RCRA.

---

**COUNSEL**

Jason R. Flanders (argued), Aqua Terra Aeris Law Group, Oakland, California; Christopher Sproul, Environmental Advocates, San Francisco, California; for Plaintiff-Appellant.

Bradley Rochlen (argued), J. Michael Showalter, and Russell B. Selman, Schiff Hardin LLP, Chicago, Illinois, for Defendant-Appellee.

Judy B. Harvey (argued) and Aaron Avila, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for Amicus Curiae United States.

**OPINION**

BERZON, Circuit Judge:

According to the complaint in this case, the Pacific Gas & Electric Company (PG&E) disperses wood treatment chemicals from various of its facilities into San Francisco and Humboldt Bays via indirect and direct stormwater discharges. The Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, allows but does not require the federal Environmental Protection Agency ("EPA") to require permits before such discharges are allowed; EPA has decided not to require permits.

Our principal question is whether the citizen suit provision of a different statute, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, may be applied to limit such discharges, or whether RCRA's "anti-duplication" provision, 42 U.S.C. § 6905(a), precludes RCRA's application because of EPA's unexercised authority to regulate the discharges. The district court determined that RCRA's anti-duplication provision does preclude that statute's application to the stormwater discharges here at issue. We do not agree.

## I. Statutory Background

At the heart of this case is the overlap between two statutory schemes, the Resource Conservation and Recovery Act and the Clean Water Act. We begin by outlining the statutes and identifying the provisions most relevant here.

## A. The CWA and stormwater discharges

The Clean Water Act, enacted in 1972 as an amendment to the Federal Water Pollution Control Act, was designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see* Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816. The CWA generally prohibits the unregulated "discharge of any pollutant" from any "point sources" into the navigable waters of the United States, although such discharges are allowed if made in compliance with a CWA permit program. 33 U.S.C. § 1311(a), (e).

The principal permitting program, the National Pollution Discharge Elimination System ("NPDES"), is defined in CWA section 402, 33 U.S.C. § 1342. EPA or EPA-authorized states, including California, issue and enforce permits under the program. *See* 33 U.S.C. § 1342(b); *Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1198 (9th Cir. 2013). California has authorized regional water boards to act as NPDES permitting authorities. *Id.* at 1198–99.

After the CWA's passage in 1972, EPA categorically exempted stormwater from NPDES permit regulations. In 1977, however, the D.C. Circuit held that categorical exemption invalid. *NRDC v. Costle*, 568 F.2d 1369, 1377 (D.C. Cir. 1977). Ten years after *Costle*, Congress amended the CWA to address the NPDES permitting of stormwater discharges. *See* Water Quality Act of 1987, Pub. L. No. 100-4 § 405, 101 Stat. 7 , 69–71 (codified at 33 U.S.C. § 1342(p)).

Specifically, the 1987 Act established a moratorium on NPDES permit requirements for most types of stormwater discharges. 33 U.S.C. § 1342(p)(1), (p)(2); *see Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 603 (2013). Exempted from this moratorium were discharges from industrial activity, large and medium-sized municipal storm sewer systems, and sources previously subject to permits.[1]   33 U.S.C. § 1342(p)(2)(A)–(D). The Act also directed EPA to develop and implement permit procedures for exempted discharges. 33 U.S.C. § 1342(p)(3), (p)(4). EPA's regulations under that directive became known as "Phase I Regulations." *See, e.g.*, *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 842 (9th Cir. 2003).

The 1987 Act also identified the next phase of stormwater requirements, which became known as "Phase II." *See id.* at 840. During that phase, EPA was required to "designate stormwater discharges . . . to be regulated" and then to "establish a comprehensive program to regulate such designated sources." 33 U.S.C. § 1342(p)(6). EPA was directed to, "at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines." *Id.* The Act authorized EPA to implement this program by setting "performance standards, guidelines, guidance, and management practices and treatment requirements," *id.*, and, as needed, by imposing permit requirements, *Envr. Def. Ctr.*, 344 F.3d at 844.

---

[1] Additionally, EPA was authorized to require permits on a case-by-case basis for any source it determined to be a "contribut[or] to a violation of a water quality standard or . . . a significant contributor of pollutants to waters of the United States." 33 U.S.C. § 1342(p)(2)(E).

EPA promulgated its "Phase II Regulations" in 1999. *See National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges*, 64 Fed. Reg. 68,722 (Dec. 8, 1999) ("Phase II Regulations"). In those regulations, EPA designated only two categories of stormwater discharges as coming within its Phase II-required permitting program: discharges from small municipal sewer systems and discharges associated with small construction activity. *Id.*

PG&E's stormwater discharges do not fall into either Phase II-regulated category. It is also common ground for purposes of this appeal that the Phase I Regulations—and all other relevant provisions in the CWA—do not require PG&E to get a permit for its stormwater discharges. *See* n. 6, *infra*. The upshot is that no CWA-grounded permit requirement applies to PG&E's stormwater discharges.

## B. RCRA, citizen suits, and anti-duplication

RCRA has a different focus than the CWA. RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). Enacted in 1976, RCRA aimed to

> eliminate[] the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. . . . [T]he [relevant] Committee believe[d] that [RCRA was] necessary if other environmental laws [were] to be both cost and environmentally effective. . . . [T]he federal

> government [was] spending billions of dollars
> to remove pollutants from the air and water,
> only to dispose of such pollutants on the land
> in an environmentally unsound manner . . . .
> often result[ing] in air pollution, subsurface
> leachate and surface run-off, which affect air
> and water quality.   [RCRA aimed to]
> eliminate this problem and permit the
> environmental laws to function in a
> coordinated and effective way.

H.R. Rep. No. 94-1491, at 4 (1976), *reprinted in* 1976
U.S.C.C.A.N. 6238, 6241–42.

As here relevant, RCRA provides for private enforcement
via citizen suit.  It allows, first, for private actions against
entities "alleged to be in violation of any permit, standard,
regulation, condition, requirement, prohibition, or order
which has become effective pursuant to [RCRA]." 42 U.S.C.
§ 6972(a)(1)(A).  It also creates a private cause of action
against a person "who has contributed or who is contributing
to the past or present handling, storage, treatment,
transportation, or disposal of any solid or hazardous waste
which may present an imminent and substantial
endangerment to health or the environment." 42 U.S.C.
§ 6972(a)(1)(B).  We refer to the latter RCRA section in this
opinion as the "endangerment provision."

The endangerment provision does not require a private
plaintiff to show that the defendant's actions violated any
specific RCRA requirement or any RCRA-mandated order or
permit.  *See Goldfarb v. Mayor & City Council of Baltimore*,
791 F.3d 500, 505 (4th Cir. 2015); *see also AM Int'l, Inc. v.
Datacard Corp., DBS*, 106 F.3d 1342, 1349 (7th Cir. 1997).

Rather, the endangerment provision broadly permits relief "that ameliorates present or obviates the risk of future 'imminent' harms." *Meghrig*, 516 U.S. at 486.

Notwithstanding RCRA's overarching goals and its expansive citizen suit provisions, RCRA does not supersede conflicting requirements established under other environmental statutes, including the CWA. Toward that end, RCRA section 1006 contains two provisions addressing the potential duplicative regulation that might otherwise result from RCRA's application alongside substantively overlapping environmental statutes.

First, the statute's "integration"[2] provision, RCRA section 1006(b)(1), requires:

> The [EPA] Administrator shall integrate all provisions of this chapter for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act, *the Federal Water Pollution Control Act [i.e., CWA]*, the Federal Insecticide, Fungicide, and Rodenticide Act, the Safe Drinking Water Act, the Marine Protection, Research and Sanctuaries Act of 1972, and such other Acts of Congress as

---

[2] Although both RCRA section 1006 provisions, together, have sometimes been called RCRA's "anti-duplication provisions," *see, e.g.*, *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 865 (N.D. Cal. 2015), we differentiate between the distinct provisions by referring only to section 1006(a) as RCRA's "anti-duplication provision" and by using a separate moniker, "integration provision," for RCRA section 1006(b)(1).

> grant regulatory authority to the Administrator. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this chapter and in the other acts referred to in this subsection.

42 U.S.C. § 6905(b)(1) (emphasis added) (internal citations omitted).

Second, the statute's "anti-duplication" provision, RCRA section 1006(a), states:

> Nothing in this chapter shall be construed to apply to . . . any activity or substance which is subject to *the Federal Water Pollution Control Act [i.e., CWA]*, the Safe Drinking Water Act, the Marine Protection, Research and Sanctuaries Act of 1972, or the Atomic Energy Act of 1954 except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.

42 U.S.C. § 6905(a) (emphasis added) (internal citations omitted). The RCRA anti-duplication section is the statutory focus of this appeal.

## II.  Factual and Procedural Background

### A.  Pleadings and Fact Discovery

Ecological Rights Foundation ("EcoRights") filed suit against PG&E under the citizen suit provisions of both the

CWA and RCRA.  *See* 33 U.S.C. § 1365(a); 42 U.S.C. § 6972(a)(1)(B).  In its operative complaint, EcoRights alleged that PG&E violated the CWA and RCRA by discarding toxic wood treatment chemicals at thirty-one of its Northern California corporation yards and service centers. Those facilities "provide service and maintenance on [PG&E's] electric and gas distribution system."  According to the complaint, PG&E uses the service yards to store and handle new, used, and discarded wooden utility poles that have been treated with a wood preservative called pentachloraphenol ("PCP").  PCP contains dioxins, chemical impurities known to increase cancer risk and cause "adverse non-cancer effects in animals and humans," including reproductive harms.

Drilling, cutting, moving, and storing the treated wood, EcoRights alleged, leads to the spread of chemically treated sawdust and woodchips on the PG&E facilities' grounds. Additionally, at some service facilities, PG&E treats new poles with PCP-infused oils and then cleans or stores the newly treated poles in a manner that allows excess oil to drip to the pavement.  EcoRights further identified several methods of dispersal, or "pathways," by which PG&E allowed or encouraged the PCP-infused waste to migrate from its facilities into San Francisco and Humboldt Bays ("the Bays").

EcoRights claimed that PG&E's activities violated (1) the CWA, by discharging pollution into the waters of the United States without a permit, and (2) RCRA, by contributing to the handling, storage, or disposal of solid waste disposal which may present an imminent and substantial endangerment to health and the environment in and around the Bays. EcoRights' RCRA claim rests on the allegation that PG&E's

stormwater conveyance systems or vehicle tires carried the PCP-infused waste offsite, with the result that the waste ended up in the Bays.

The district court confined initial fact discovery to four of the thirty-one Northen California facilities listed in EcoRights' complaint. The parties accordingly proceeded with discovery only as to one PG&E facility in Oakland, one in Hayward, and two in Eureka.

## B. Summary Judgment Orders

After discovery concerning the four facilities, the parties filed cross-motions for partial summary judgment as to EcoRights' standing. EcoRights' RCRA claim was founded on PG&E's "on-site waste disposal practices [that] present an imminent and substantial endangerment to health or the environment with respect to . . . San Francisco and Humboldt Bays." Members of EcoRights filed declarations attesting that their aesthetic and recreational enjoyment of the Bays had been and would continue to be impaired by pollution traceable to PG&E discharges. Based on the member declarations, the district court concluded that EcoRights had organizational standing to pursue the RCRA claim.

The parties next filed cross-motions for summary judgment on EcoRights' claim that stormwater discharges from the facilities violated the CWA. Citizen suits against private parties under the CWA are authorized only for alleged violations of an effluent standard or limitation imposed under the statute—here, an alleged failure to obtain required NPDES permits. *See* 33 U.S.C. § 1365(a). The district court held that, under EPA's Phase I Regulations addressing industrial activity, 40 C.F.R. § 122.26(b)(14), PG&E was not

required to obtain NPDES permits for stormwater discharges from the four facilities.  The district court therefore granted PG&E's motion for summary judgment on the CWA claim.

Cross-motions for summary judgment on the RCRA claim followed.  The district court held "[t]he basic facts regarding PG&E's handling of utility poles at its facilities . . . largely undisputed, at least for the purposes of [the] motion[s]."  The undisputed evidence, the district court held, indicated that (1) PCP-laden oils drip off of new poles that are stored outdoors on uncovered racks; (2) used poles are sometimes cut into smaller pieces at the facilities, leaving PCP-treated sawdust on the ground; and (3) all retired, chopped-up poles are supposed to be stored in watertight waste bins, but such PCP-treated waste products are sometimes left directly on the ground.  In sum, the district court concluded, PCP oils and PCP-treated wood waste end up on the ground at the PG&E facilities.

The district court divided its analysis of the RCRA claim into two parts, based on the two different "pathways" by which PCP-infused wastes allegedly travel offsite and into the Bays.  The district court held, first, that the tire-tracking theory failed because EcoRights had not "come forward with actual evidence, as opposed to speculation," regarding vehicle tracking at PG&E sites.  Second, the district court concluded that EcoRights' stormwater-based pathway failed because "there is no question that stormwater discharged from point sources like the PG&E facilities is subject to regulation under the Clean Water Act," and it interpreted RCRA's anti-duplication provision to prevent the creation under RCRA of "an additional avenue to impose a different regulatory requirement."  These holdings applied only to the four facilities for which discovery had occurred, but the district

court noted that "the conclusions presumptively apply equally to the remaining sites." In so disposing of the case, the district court did not decide whether the PCP-infused materials were "solid wastes" within the meaning of RCRA, or whether PG&E's handling or disposal of the materials may present an "imminent and substantial endangerment to health or the human environment."

## C. Appeal

EcoRights appeals the grant of summary judgment to PG&E on the RCRA claim only. Its primary assertion is that the district court erroneously interpreted RCRA's anti-duplication provision, RCRA section 1006(a). *See* 42 U.S.C. 6905(a). EcoRights also appeals the denial of its motion for summary judgment on the RCRA claim with respect to both the stormwater and tire-tracking pathways.

EPA filed a brief as amicus curiae and appeared at argument in support of EcoRights. EPA maintains that PG&E did not identify an actual inconsistency between the CWA and RCRA, and that the district court therefore erred in holding that RCRA's anti-duplication provision restricted the reach of EcoRights' citizen suit under RCRA.

In its answering brief, PG&E disagrees with EcoRights and EPA as to the impact of the RCRA anti-duplication provision. PG&E also renews, with respect to the Hayward facility only, its argument that EcoRights lacks organizational standing to sue.

### III. Standing

We consider first whether EcoRights has standing to sue PG&E regarding PG&E's disposal activities at its Hayward facility. It does.[3]

To have organizational standing, at least one EcoRights member must "have standing to sue in [his] own right." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975). Thus, EcoRights must show that (1) a member "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., TOC, Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–51 (1992)); *see also Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547–50 (2016).

---

[3] PG&E did not need to file a cross-appeal to raise this standing argument. Where an appellee properly raised an argument in the district court and raises it on appeal in an effort "seek[ing] to preserve, and not to change, the judgment," it need not file a cross-appeal. *See Lee v. Burlington N. Santa Fe Ry. Co.*, 245 F.3d 1102, 1107 (9th Cir. 2001) (internal quotation marks and citations omitted). PG&E properly raised its standing argument in the district court. Its reiterated argument on appeal, if meritorious, would support the district court's judgment as to the Hayward facility. There is no persuasive basis for distinguishing this type of partial support for the judgment from the general rule regarding when cross-appeals are necessary. We therefore apply the rule stated in *Lee*.

PG&E maintains that EcoRights failed to demonstrate that any of its members suffered an injury in fact with respect to the Hayward facility. Not so.

EcoRights presented declarations from several of its members alleging particularized harms resulting from pollution in the San Francisco Bay. In these declarations, some EcoRights members reported they "avoid" local seafood "due to . . . concerns about pollution in San Francisco Bay." A member identified "activities, such as wading or swimming in the Bay, that I will not do because I am concerned about being exposed to the pollutants in the Bay," another expressed similar concerns about "risk to [her] daughter's health in regularly swimming in San Francisco Bay given the presence of pollutants." One member noted that alleged pollution in the Bay "decreases my enjoyment of sailing in San Francisco Bay and my enjoyment of viewing birds and other wildlife in the San Francisco Bay," and other bird- and wildlife-watching members agreed. One member, summarizing her concerns, stated that despite "gain[ing] significant personal feelings of well-being, including relaxation and spiritual enrichment from time spen[t] in unspoiled natural environments," her "enjoyment of the Bay and its tributaries has been substantially diminished by . . . increasing knowledge of how polluted the Bay is, including from storm water runoff pollution."

PG&E maintains that these injury allegations are too generalized, as such injuries may be shared by millions of people who live in or travel to the San Francisco Bay Area. That contention falls short.

"[T]he fact that a harm is widely shared does not necessarily render it a generalized grievance." *Novak v.*

*United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (internal citations and quotation marks omitted).  Rather, a grievance too "generalized" for standing purposes is one characterized by its "abstract and indefinite nature—for example, harm to the common concern for obedience to law."  *Id.* (internal citation and quotation marks omitted).  Here, several EcoRights members have attested to concrete and particularized harm to their own "recreational, aesthetic, and spiritual" uses and enjoyment of "the waters of San Francisco Bay adjacent to Alameda County and Central San Francisco Bay."  That alleged injury is neither abstract nor indefinite, so the generalized grievance bar does not apply.

PG&E also proposes that for the alleged injury to be "credible," EcoRights' members must demonstrate that their uses or enjoyment of San Francisco Bay are near PG&E's facilities.  That contention too misses the mark.

"The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct."  *Pac. Lumber Co.*, 230 F.3d at 1147.  A proximity concern arises only where "a plaintiff claiming injury from environmental damage [fails to demonstrate] use [of] the area *affected by the challenged activity*," and instead only shows that she uses "an area roughly 'in the vicinity' of it."  *Lujan*, 504 U.S. at 565–66 (citation omitted) (emphasis added).  Whether the members use an area near the *source* of environmental damage elsewhere is of no moment.

Here, EcoRights' RCRA suit is based on alleged endangerment to San Francisco Bay as a whole posed by PG&E's onsite waste disposal practices at its facilities.  So it

suffices for EcoRights to demonstrate concrete and particularized injuries to its members' aesthetic and recreational enjoyment of San Francisco Bay as a whole.

At bottom, PG&E's arguments appear to challenge as implausible the notion that polluted stormwater from the Hayward facility could possibly have an environmental impact on a body of water as large as San Francisco Bay. "Requiring the plaintiff to show actual environmental harm as a condition for standing," however, "confuses the jurisdictional inquiry (does the court have power under Article III to hear the case?) with the merits inquiry (did the defendant violate the law?)." *Pac. Lumber Co.*, 230 F.3d at 1151.

Moreover, "[t]he 'injury in fact' requirement in environmental cases is not . . . reducible to inflexible, judicially mandated time or distance guidelines. . . ." *Id.* at 1148. For instance, in *Laidlaw*, a Sierra Club member who "claimed only that he 'had canoed' on the river some 40 miles downstream from the incinerator" afforded the Sierra Club standing to bring a CWA action against the incinerator's owner. *Pac. Lumber Co.*, 230 F.3d at 1149 (citing *Laidlaw*, 528 U.S. at 183).

By attesting to their reduced ability to enjoy eating local seafood in Bay Area restaurants, observing birds and other wildlife from the air or from the wetlands around Oakland Airport, or sailing and swimming safely in San Francisco Bay, among other harms, EcoRights members have alleged concrete and particularized injuries from the alleged migration of PCP and dioxins from PG&E's Hayward facility to the affected area, San Francisco Bay. Whether that inflow of pollutants from PG&E's Hayward facility is actually

significant enough to harm the affected area is a merits question, not a standing question.

## IV. Stormwater Pathway

We turn now to the core of this appeal—whether PG&E was entitled to summary judgment with respect to EcoRights' stormwater RCRA claim in light of RCRA's anti-duplication provision. The district court reasoned that stormwater discharge into navigable waters is "subject to [the CWA]" under RCRA's anti-duplication provision, 42 U.S.C. § 6905(a), in the sense that EPA *could* require NPDES permits for the types of stormwater discharges like those challenged here, although it has not.

The anti-duplication provision in RCRA section 1006(a) does not reach so far. The language, context, and persuasive authorities interpreting that provision, we conclude, require us to determine whether the CWA *actually* imposes any specific statutory "requirements" on PG&E's stormwater discharges, and, if so, whether those "requirements" are "inconsistent" with any possible remedy under EcoRights' RCRA citizen suit. 42 U.S.C. § 6905(a). That inquiry reveals that, because the CWA and its implementing regulations do not require PG&E to obtain a permit for its stormwater discharges, there is no CWA-grounded requirement here imposed, and so none can be inconsistent with the RCRA citizen suit section.

## A. Insufficiency of Potential Regulation As a Trigger of RCRA's Anti-Duplication Provision

To construe RCRA's anti-duplication provision, we first consider whether its meaning is clear. *See Avila v. Spokane*

*Sch. Dist. 81*, 852 F.3d 936, 941 (9th Cir. 2017). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Geo–Energy Partners–1983 Ltd. v. Salazar*, 613 F.3d 946, 956 (9th Cir. 2010) (internal quotation marks and citation omitted).

### 1.  Text of RCRA's Anti-Duplication Provision

RCRA's anti-duplication provision, section 1006(a), initially curtails RCRA's application with respect to "any activity or substance which is subject to" the CWA, the Safe Drinking Water Act, the Atomic Energy Act, and the Marine Protection, Research and Sanctuaries Act.   42 U.S.C. § 6905(a).   The provision then goes on to carve out a substantial exception: RCRA can overlap with the four named statutes to the extent that its application is "not inconsistent with the requirements" of those other statutes.  *See id.*

"[I]nconsistent" is not defined in section 1006(a) or anywhere else in RCRA. *See Goldfarb*, 791 F.3d at 509–10. After consulting the dictionary definition of the term, the Fourth Circuit concluded that the "CWA must require something fundamentally at odds with what RCRA would otherwise require" to be "inconsistent" for the purposes of RCRA's anti-duplication provision.  *Id*. at 510 (citations omitted).  We agree.  According to the dictionary definition of "inconsistent," the application of RCRA must be "incompatible, incongruous, [or] inharmonious" with CWA requirements for the anti-duplication provision to apply. Webster's Third New Int'l Dictionary (1971) at 1144; *accord* Webster's Third New Int'l Dictionary (2002) at 1144.  Put another way,  section 1006(a)  does not  bar  RCRA's

application unless requirements under RCRA and the CWA are "[m]utually repugnant or contradictory," such that the application of "one implies the abrogation or abandonment of the other." Black's Law Dictionary 907 (4th ed. rev. 1968); *see also* Black's Law Dictionary (10th ed. rev. 2014) (defining "inconsistent" as "[l]acking agreement among parts; not compatible with another fact or claim").

The anti-duplication provision also does not provide a definition of the term "requirements." But the reference to the "requirements" of certain *statutes* must refer to *legal* requirements. A legal requirement is "a rule of law that must be obeyed," *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1171 (9th Cir. 2009) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005)) (internal quotation marks omitted)—in other words, "[s]omething that must be done because of a law or rule; something legally imposed, called for, or demanded." Black's Law Dictionary (10th ed. 2014); *see also* Black's Law Dictionary 1468 (4th ed. rev. 1968) (defining "require" as "[t]o direct, order, demand, instruct, command, claim, compel, request, need, exact").

Taking the terms together, then, RCRA's anti-duplication provision does not bar RCRA's application unless that application contradicts a specific mandate imposed under the CWA (or another statute listed in RCRA section 1006(a)).

### 2.  Context of RCRA's Anti-Duplication Provision

The pertinent contexts—RCRA section 1006 as a whole and RCRA's overall statutory scheme—support this reading. Two provisions in RCRA are meaningful only if the CWA's

*potential* application to a waste product does not, on its own, bar RCRA's application.

First, the CWA and two other statutes listed in RCRA section 1006(a) are also listed in RCRA section 1006(b)(1), RCRA's "integration" provision.**[4]**    *See* 42 U.S.C. § 6905(b)(1).    This provision requires EPA to administer RCRA in a coordinated manner, "avoid[ing] duplication, to the maximum extent practicable, with the appropriate provisions" of the CWA, the Safe Drinking Water Act, the Marine Protection, Research and Sanctuaries Act of 1972, and other environmental statutes.    *Id.*    But the provision directs EPA to integrate application or enforcement of the various statutes only when doing so is "consistent with the goals and policies expressed" in RCRA and the other environmental statutes.    *Id.*

By including the CWA in the integration provision, Congress recognized that there would be overlapping coverage between the CWA and RCRA, the anti-duplication provision notwithstanding.    This understanding of RCRA's

---

**[4]** The integration provision directs the EPA to administer and enforce RCRA provisions in a manner that "integrate[s]" them and "avoid[s] duplication, to the maximum extent practicable, with the appropriate provisions of [the CWA]" and other EPA-enabling statutes.    42 U.S.C. § 6905(b)(1).    The provision has no direct application here, as it addresses the EPA Administrator and concerns the EPA's internal management of its various statutory mandates.    *See id.*    In an endangerment citizen suit such as this one, no violation of a RCRA permit, regulation, or other EPA-administered requirement need be alleged.    *See* 42 U.S.C. § 6972(a)(1)(B); *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 514 (9th Cir. 2013) ("*ERF I*") (summarizing the components of an endangerment suit).    EPA's administration and enforcement of its various statutory mandates are thus not directly pertinent.    Instead, RCRA section 1006(b)(1) is relevant only for statutory context.

integration provision is hard to reconcile with PG&E's proposed interpretation of the anti-duplication provision. If RCRA's application were prohibited as to all matters *potentially* regulable under the CWA, as PG&E supposes, the integration clause in RCRA section 1009(b)(1) would serve little purpose.

Second, PG&E's interpretation would also render meaningless specific exclusions from RCRA coverage. RCRA extends only to "solid wastes." 42 U.S.C. § 6903(27); *see also* 42 U.S.C. § 6903(5) (defining hazardous waste as a type of solid waste); *Meghrig*, 516 U.S. at 483. The statute's definition of "solid wastes" specifically excludes "industrial discharges which are point sources *subject to permits* under [CWA section 402] or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954. . . ." 42 U.S.C. § 6903(27) (emphasis added). If *any* potential regulation of *any* substance under the CWA or the Atomic Energy Act were enough to trigger the RCRA anti-duplication provision and so bar RCRA coverage, RCRA's narrower exclusion of certain substances actually "subject to permits under" the CWA and the Atomic Energy Act would be superfluous. *Id.*

### 3. Persuasive Authorities

In line with our analysis of the statute's language and context, most other courts have applied RCRA's anti-duplication provision only where there is an inconsistency with specific mandates, such as permit requirements and consent orders, imposed under a listed statute. *See Edison Elec. Inst. v. U.S. EPA*, 996 F.2d 326, 337 (D.C. Cir. 1993); *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 866 (N.D. Cal. 2015); *Cmty. Ass'n for Restoration of the*

*Env't, Inc. v. George & Margaret LLC*, 954 F. Supp. 2d 1151, 1160 (E.D. Wash. 2013); *Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-cv-4117, 2013 WL 103880, at *27 (D.N.J. Jan. 8, 2013) (unpublished).

Similarly, courts generally have held that there is no "inherent inconsistency of applying RCRA to activities already regulated by [one of the statutes listed in RCRA section 1006(a)]." *Vernon Vill., Inc. v. Gottier*, 755 F. Supp. 1142, 1154 (D. Conn. 1990) (emphasis omitted). For example, in *Edison Electric Institute*, the D.C. Circuit rejected the defendant's "generalized claim that the Agency's interpretation [which applied RCRA to "impose additional burdens on nuclear power generators"] interferes with the 'primary purpose' of the AEA." 996 F.2d at 337 (citations omitted).

Additionally, in 1984, the Department of Justice's ("DOJ") Office of Legal Counsel ("OLC") determined that RCRA's anti-duplication provision does not come into play simply because there are "overlapping regulatory schemes." *See Application of the Res. Conservation and Recovery Act to the Dep't of Energy's Atomic Energy Act Facilities*, 8 Op. O.L.C. 6, 11, 13, 1984 WL 178349 (1984) ("OLC Opinion"). The OLC Opinion was issued to address a disagreement between EPA and the Department of Energy concerning whether waste treatment and disposal activities at the Department of Energy's nuclear facilities were subject to RCRA regulation. *Id.* at 6. The OLC sided with EPA, concluding that the "requirements" language of RCRA section 1006(a) "implies some prescriptive content, *i.e.*, specific directives that require an agency or a person to take or refrain from taking certain actions, to follow certain procedures, or to meet certain standards and regulations." *Id.*

at 16. And, said OLC, section 1006(a)'s "not inconsistent" language requires determining whether there is a conflict "between individual regulations or requirements imposed by" the statutes listed in section 1006(a) and the would-be requirements imposed under RCRA. *Id.* at 11, 13, 16. Under the OLC interpretation—as under ours—the potential for inconsistent overlap is insufficient; only an actual, and actually inconsistent, requirement triggers the RCRA anti-duplication provision.[5]

These persuasive authorities support our reading of the text of RCRA section 1006(a) and its statutory context. RCRA's anti-duplication provision does not bar RCRA's application unless the specific application would conflict with identifiable legal requirements promulgated under the CWA or another listed statute.

---

[5] DOJ, not EPA, issued the OLC Opinion. As that opinion is not an agency interpretation of its own enabling statute, we do not afford it *Chevron* deference. *See Ass'n of Civilian Technicians, Silver Barons Chapter v. Fed. Labor Relations Auth.*, 200 F.3d 590, 592 (9th Cir. 2000). And, under *Auer v. Robbins*, while "we defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation,'" "no deference [is] warranted to an agency interpretation of what [are], in fact, Congress' words." *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208, 210 (2011) (citing *Gonzales v. Orgeon*, 546 U.S. 243, 257 (2006)). It is thus not enough to trigger *Auer* deference that DOJ, acting as counsel for EPA in its amicus appearance in this case, favorably cites the OLC Opinion. And we are not aware of any EPA regulations, rulings, or specific administrative practices that rely on the OLC's 1984 interpretation. We therefore treat the OLC Opinion similarly to the persuasive authority provided in decisions from other courts—that is, as some corroboration that our own reasoning is sound. *Cf. Andersen v. DHL Ret. Pension Plan*, 766 F.3d 1205, 1213 (9th Cir. 2014) (relying on a government amicus brief's position as "reasonable and persuasive" even though not entitled to deference).

## B. Application of RCRA's Anti-Duplication Provision Here

We next consider whether PG&E has identified such legal requirements.

What CWA legal requirements might apply here?  PG&E has not identified any CWA permits that establish particular requirements for its stormwater discharges.  That gap is not an oversight.  The Clean Water Act does not require PG&E to get a permit for these discharges.[6]  And, although the CWA provides EPA authority to require such permits under its Phase II authority, the Agency, following the protocol set out by Congress for making decisions, *see* 33 U.S.C. § 1342, has decided not to require such permits.

Given these circumstances, PG&E's argument centers on EPA's decision *not* to impose a Phase II CWA permit requirement on discharges like its own.  That decision, PG&E maintains, bars any application of RCRA, including the RCRA endangerment provision.  We cannot agree.

CWA section 402(p)(6) directed EPA to establish a "comprehensive program" for Phase II-covered stormwater

---

[6] The district court's determination that PG&E's stormwater discharges do not fall within the ambit of EPA's regulations of industrial sources (so-called Phase I regulations) has not been appealed.  We therefore assume it correct for purposes of this case.  *See, e.g.*, *Wagner v. Prof'l Eng's in Cal. Gov't*, 354 F.3d 1036, 1040–41 (9th Cir. 2004) (assuming the district court's unappealed merits determination was correct and proceeding to the remaining remedies question on appeal).

discharges 33 U.S.C. § 1342(p)(6).[7] But the reach of that "comprehensive program" was limited to the discharges EPA "designate[s] . . . to be regulated." *Id.* The CWA instructs EPA to "establish priorities" for implementing the comprehensive program. *Id.* The statute thus authorizes EPA to develop a stormwater discharge regulatory program by regulating Phase II-covered stormwater sources in stages, relegating some sources to a lower regulatory "priorit[y]," and leaving some un-"designated" altogether. *Id.*; *see Envtl. Def. Ctr.*, 344 F.3d at 875. Under such an incremental regulatory structure, EPA's decision *not* to impose a permit requirement on stormwater discharges like PG&E's is not a "rule of law that must be obeyed," *Gorman*, 584 F.3d at 1171 (internal quotation marks and citation omitted). It is, instead, a decision to impose no such "rule of law," *id.*, even though EPA is empowered to do so. There is no "mutual[] repugnan[cy]" between the current *absence* of a permit requirement and compliance with RCRA as enforced through a citizen suit. Black's Law Dictionary 907 (4th ed. rev. 1968).

---

[7] CWA section 402(p)(6) provides in full: "Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5) [of CWA section 402(p)]) which designate stormwater discharges, other than those discharges described in paragraph (2) [of CWA section 402(p)], to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate." 33 U.S.C. § 1342(p)(6).

Notably, the Phase II Regulations indicate that EPA considered RCRA's application to stormwater discharges while deciding the types of stormwater given priority for designation. The agency decided to exclude at least some discharges from its Phase II Regulations *because* RCRA and other statutes would still apply to those discharges.

In EPA's final Phase II Regulations, the Agency designated two types of stormwater discharges as subject to permits: discharges from small municipal sewer systems and discharges associated with small construction activity. *See* Phase II Regulations, 64 Fed. Reg. at 68,722. In the lead up to those regulations, EPA considered whether it should also designate other types of industrial and commercial sources as requiring permits. Because the Phase I Regulations classified "industrial sources" based on standardized industry classifications, EPA first considered the industrial sources with environmental impacts most similar to the sources regulated under Phase I. *See id.* at 68,779–80.

The agency determined that many of these "unregulated" industrial and commercial sources had "a high likelihood of exposure of pollutants." *Id.* at 68,780. Nevertheless,

> EPA assessed the likelihood that pollutant sources are regulated in a comprehensive fashion under other environmental protection programs, such as programs under the Resource Conservation and Recovery Act (RCRA) or the Occupational Health and Safety Act (OSHA). If EPA concluded that the category of sources was sufficiently addressed under another program, the Agency

rated that source category as having "low" potential for adverse water quality impact.

*Id.* Ultimately, EPA did

not designate any additional industrial or commercial category of sources [in its Phase II Regulation,] either because EPA currently lack[ed] information indicating a consistent potential for adverse water quality impact or because of EPA's belief that the likelihood of adverse impacts on water quality is low, with some possible exceptions on a more local basis.

*Id.*[8]

The Phase II Regulations' preamble further underscores that the Regulations addressed undesignated sources only to the extent that they "encourage[d] control of storm water discharges from [undesignated industrial and commercial sources] through self-initiated, voluntary [best management practices], unless the discharge (or category of discharges) is designated for permitting by the permitting authority." *Id.* A policy of encouraging voluntary practices imposes no legal requirement. *See Gorman*, 584 F.3d at 1171.

In sum, neither CWA section 402(p)(6) nor the Phase II Regulations promulgated under it impose any legal

---

[8] EPA, appearing in this case as amicus curiae, relies on this rulemaking history in support of its position that RCRA can and does apply to point-source industrial stormwater discharges not subject to CWA permit requirements under the Phase II Regulations.

requirement on undesignated sources of stormwater discharges.  Instead, the Regulations rest in part on the assumption that RCRA and other statutes would still apply to undesignated sources.  As there is no requirement, there can be no inconsistent requirement barring RCRA's application.

## C.  Municipal Permits

Our principal question answered, we proceed to the remaining issues on appeal.  We consider PG&E's alternative anti-duplication contention—that its stormwater discharges are subject to CWA requirements via the municipal storm sewer system permits required of and held by local government agencies—and conclude it fares no better than the broader position we have rejected.[9]

As a preliminary matter, EcoRights points to evidence that at least some PG&E discharges at its Oakland facility do not flow through municipal storm sewer systems at all. According to EcoRights' expert, the facility's drainage map indicates two points at which its stormwater discharges enter navigable waters, including one point that "discharges directly into San Leandro Bay."  PG&E's Environmental Operations Supervisor for the Oakland facility similarly testified that the facility's storm drain "feeds directly into the bay."  This evidence indicates that any potential requirements

---

[9] In its answering brief, PG&E makes this municipal permit argument only obliquely.  Although we consider the argument on the merits, we note PG&E came close to waiving it through inadequate briefing.  *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (holding that "[w]e review only issues which are argued specifically and distinctly in a party's . . . brief," and finding the plaintiff's broad challenge to a provision of the Federal Aviation Act "waived due to his failure to present a specific, cogent argument for our consideration").

under Oakland's storm water permit are not relevant to RCRA's application to the Oakland facility.

In any event, although the permits and ordinances to which PG&E alludes are judicially noticeable public records, *see* Fed. R. Evid. 201(b), PG&E has not in its briefs presented any specific factual or legal argument concerning *requirements*—consistent or inconsistent with RCRA—imposed *on it* under those permits and ordinances. We "will not do an [appellee's] work for it, either by manufacturing its legal arguments, or by combing the record on its behalf for factual support." *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012) (citations omitted).

PG&E highlights a few requirements that the San Francisco Bay Region Municipal Regional Stormwater Permit imposes on the cities of Oakland and Hayward as permittees. Under the regional permit, PG&E states, the cities must "implement an industrial and commercial site control program" and develop "an Enforcement Response Plan (ERP) to prevent discharge of pollutants and impact on beneficial uses of receiving waters." PG&E also points to a Eureka ordinance enacted as part of that city's compliance with California's general NPDES permit for small municipal storm systems; that ordinance prohibits "illicit connections" and "establishes requirements for reducing pollutants in storm water."

At this level of generality, such requirements are not inconsistent with the injunctive relief EcoRights seeks under RCRA against PG&E. Nor is it obvious how some of these NPDES requirements for *municipalities* would be relevant to a *private party's*—here, PG&E's—legal responsibilities. As

PG&E has not pointed to any specific stormwater discharge requirement with which it must comply imposed by or pursuant to any CWA municipal storm system permits, it was not entitled to summary judgment on the basis of those permits.

## V.  Tire Tracking Pathway

Finally, we address the district court's conclusion that EcoRights "failed to come forward with evidence sufficient to create a triable issue of fact that the waters of San Francisco or Humboldt Bays are endangered by [PCP] dispersed from the corporation and service yards by tracking on vehicle tires," as there was "no evidence of actual transmission of the pollutants from PG&E's facilities to municipal stormwater systems via the . . . tire tracking [pathway], much less of resulting Bay pollution at a level sufficient to support a RCRA claim." We agree with this assessment of the summary judgment record.

In a RCRA endangerment citizen suit like this one, the plaintiff must show: [1] the defendant is "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, [2] who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste [3] which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B); *see also ERF I*, 713 F.3d at 514. Whether PG&E allowed PCP-infused wastes to travel offsite via vehicle tires implicates the second prong of EcoRights' RCRA substantial endangerment claim—*i.e.*, whether PG&E contributed to the handling or

transporting of PCP-infused waste through attachment to vehicle tires.

The second endangerment prong requires the plaintiff to show "that a defendant be actively involved in or have some degree of control over the waste disposal process." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011). So EcoRights had to present evidence showing that PG&E is involved in or has control over the *actual* waste disposal activities challenged as imminently dangerous. Only at the third prong, with regard to the likely health or environmental impact of those activities, does a risk-based showing—whether the activities "*may* present an imminent and substantial endangerment to health or the environment"—suffice. 42 U.S.C. § 6972(a)(1)(B) (emphasis added).

Viewing the facts in the light most favorable to EcoRights, there is no evidence that PG&E trucks actually picked up contaminants on their tires and carried them offsite. EcoRights' expert witness on the matter testified only that tire-tracking "could be a concern," based on his "experience at other facilities where tracking is an issue." Those other sites, which were undergoing cleanup processes for dioxin contamination, had controls in place to reduce tire-tracking. Such controls included rumble strips—to vibrate off accumulated materials as trucks pass over them—and wheel washing. The EcoRights expert witnessed no rumble strips or wheel washing while onsite at the PG&E facilities. Moreover, although company policy recommends wheel-washing as a best practice, PG&E employees admitted that the practice is rarely implemented.

But EcoRights' expert did not observe any trucks driving through areas where there may have been contaminants.  Nor did he witness any tire track-marks that indicated the spread of contaminated soils or water.  Finally, EcoRights' expert did not sample for contamination the areas where trucks were likely to pass.  Moreover, he provided no standard for the level of contamination necessary to require tire-tracking controls.

Given these investigatory gaps and the "could have" language used by its expert, we conclude that EcoRights' evidence identified tire-tracking only as a *potential* mechanism by which PG&E might have contributed to the transportation and dispersal of PCP-infused wastes.  That showing does not establish that PG&E actually contributed to the handling, transportation, or disposal of solid waste via vehicle tire-tracking.  Summary judgment for PG&E was warranted as to that aspect of EcoRights' RCRA claim.

## VI.  EcoRights' Motion for Summary Judgment

The district court did not decide whether the PCP-infused wood or oil wastes at PG&E sites were "solid wastes" subject to RCRA.  It also did not determine whether PG&E's present or past handling, storage, treatment, transportation, or disposal of those wastes, overall, creates an imminent and substantial endangerment to health or the environment because of its impact on the Bays.[10]  Because the district court did not reach these merits-related questions, we remand so

---

[10] In particular, the district court did not address the admissibility or persuasiveness of expert evidence concerning PCP-contamination levels at PG&E's sites.

that they may be considered. *See Voggenthaler v. Maryland Square LLC*, 724 F.3d 1050, 1066 (9th Cir. 2013).

## VII.  Conclusion

The district court erred in applying RCRA's anti-duplication provision, RCRA section 1006(a), with respect to the stormwater pathway.  The absence of a CWA permit requirement does not trigger RCRA's anti-duplication provision.  Further, PG&E has failed to identify any legal requirements under municipal permits applicable to it and inconsistent with EcoRights' requested RCRA relief.  We therefore reverse the district court's grant of summary judgment to PG&E and denial of summary judgment to EcoRights with respect to the stormwater pathway.  We remand for the district court to consider EcoRights' arguments with respect to the stormwater pathway that the relevant wastes are "solid wastes" and that PG&E's actions present an imminent and substantial endangerment to health or the environment under RCRA.  Finally, we affirm the district court's grant of partial summary judgment as to the tire-tracking pathway.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**